Filed 6/30/14

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S135855 |
| v. | ) | |
| | ) | |
| ALEJANDRO AVILA, | ) | |
| | ) | Orange County |
| Defendant and Appellant. | ) | Super. Ct. No. 02CF1862 |
| _____ | ) | |

A jury convicted defendant of kidnapping, committing two counts of lewd and lascivious acts on, and then murdering Samantha Runnion under the special circumstances of murder while kidnapping and murder while committing lewd and lascivious acts on a child under the age of 14. (Pen. Code, §§ 187, 190.2, subd. (a)(17)(B) and (E), 207, 288, subd. (b).)[1] After a penalty trial, the jury returned a verdict of death. The court denied the automatic motion to modify the verdict (§ 190.4) and imposed that sentence. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment.

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

## I.  THE FACTS

### A.  Guilt Phase

#### 1. Prosecution Evidence

##### a.  The Crime

Around 6:30 p.m. on July 15, 2002, five-year-old Samantha Runnion and her six-year-old friend, Sarah A., were playing outside of the Smoketree condominium complex in Stanton.  Sarah observed a man driving a green car pass by them, go around the block, and approach them a second time.  The man got out of the car and asked the girls, "Have you seen a little puppy?"  Samantha asked about its size.  Suddenly, the man grabbed Samantha, threw her, screaming and struggling, into the car, and sped away.

Samantha's nude body was found the next day in a remote area near Lake Elsinore, near the intersection of the Killen Truck Trail and Ortega Highway, that is popular with hang gliders.

An autopsy performed the next morning revealed that Samantha had been sexually assaulted both vaginally and anally.  She had suffered at least two blows to the head at least half an hour before she died, which caused her brain to swell. In the pathologist's opinion, "she died as a result of mechanical asphyxiation through a compression of the neck and with the blunt-force trauma to the head contributing significantly to it also."  The pathologist could not determine exactly what had caused the compression of the neck.  Based on the degree of rigor mortis, he estimated that the child had died 30 to 36 hours before he conducted the autopsy, that is, roughly between 8:00 p.m., July 15, and 2:00 a.m., July 16, 2002.

##### b.  Evidence of Defendant's Guilt

Sarah A. did not identify anyone as the assailant, but she said "he was like Mexican," and she gave a description that very generally matched defendant's

2

appearance.  She worked with a police artist to create a drawing that she said looked like the man.  Tammy D. saw the drawing on the news and informed the police that the man they sought might be defendant.

In July 2002, defendant was living with his sister, Elvira Avila, in an apartment on Riverside Drive in Lake Elsinore.  Another sister, Adelita Avila, and defendant's mother, Adelina Avila, lived in the same complex.  The afternoon of Samantha's abduction, defendant was supposed to cook dinner for the family, with dinner expected to be around 6:00 to 6:30 p.m. that evening.  Instead, he drove around Southern California that afternoon and evening.

Bank and other records showed that defendant withdrew money from an ATM at a Bank of America branch in Lake Elsinore at 5:18 p.m. that afternoon, twice stopped at service stations, and eventually checked into a Comfort Inn in Temecula, apparently sometime shortly after 9:00 p.m. that evening.

Investigators drove the route from the bank branch to the Comfort Inn, starting one week to the minute after defendant withdrew the money.  They also stopped for a short time at the Smoketree condominium complex where Samantha was abducted, at the spot where her body was found, and at both service stations where defendant had stopped.  The total distance from the bank to the inn, including all stops, was 202 miles.  The driving time without stops was three hours 24 minutes, and, with the stops, three hours 40 minutes.  Defendant's known itinerary was consistent with his having been at the Smoketree complex at the time of the abduction, and again at the site where the body was found before he checked into the Comfort Inn.  Specifically, the investigators arrived at the Smoketree complex at 6:17 p.m. and, after stopping at the service stations and the location where the body was found, they arrived at the Comfort Inn at 8:57 p.m.

3

Defendant's sister, Elvira, testified that defendant was familiar with the area where the body was found; she had once gone there with him to watch a meteor shower.

The day after Samantha's abduction, defendant told Elvira that he had gone to the beach the previous day. She observed a scratch on the inside of his knee. He told her he had scratched his knee on a baby gate. The baby gate he referred to was plastic without rough edges.

Defendant's car, a 1994 Ford Thunderbird, was somewhat, although not entirely, similar to Sarah A.'s general description of the car the abductor had driven. It could have made the tire tracks that were found near Samantha's body.

Deoxyribonucleic acid (DNA) consistent with Samantha's DNA, and with fewer than one person in one trillion, was found in multiple locations in defendant's car.[2] DNA consistent with defendant's DNA, and with about one person in 600 million, was found in scrapings taken from under Samantha's fingernails.

In addition to tire tracks, investigators found shoe prints and one footprint near Samantha's body. No shoes seized from defendant's apartment pursuant to a search warrant could have made the shoe prints. However, a videotape of defendant from one of the service stations where he had stopped showed he was wearing what might have been a pair of Fila athletic shoes. Shoe store records showed that in September 2001 he had purchased a pair of Fila Disruptor shoes, size 12. A Fila shoebox, although no Fila shoes, was found in defendant's

---

[2] Because the frequency of one person in a trillion is so small, the laboratory that did the testing had adopted the policy of not calculating any smaller frequency numbers. For anything smaller, the examiner would just say fewer than one in a trillion.

apartment. Investigators obtained a pair of Fila Disruptor shoes, size 12. Those shoes were consistent with the shoe prints found near the body. A forensic specialist also compared defendant's feet with the footprint and found several similarities and no dissimilarities, meaning that defendant could have left the footprint.

The prosecution presented evidence that before Samantha's death, defendant had sexually molested three young girls. Catherine C., the daughter of defendant's then-girlfriend, Lizbeth V., testified that around 1997, when she was about seven years old, defendant occasionally watched her when her mother was working at night. When he did, he sometimes told her to take her clothes off in the bedroom. Over a period of close to a year, on multiple occasions, he touched her vagina with his finger and penis, "kissed" her on the mouth and vagina, and had her kiss him on his mouth and penis. On one occasion, she also saw defendant touch her cousin Alexis D.'s vagina in the same bedroom. Defendant also sometimes had her insert test tubes he got through his job into her vagina. He said he wanted her "to practice so he could put his penis when I was older."

Alexis D. testified that once, in Lizbeth V.'s bedroom, when she was seven years old, defendant put his hand on her vagina and "moved it fast." She observed him do the same thing to her cousin, Catherine C.

Defendant was charged with and tried for molesting these two girls but, in January 2001, a jury acquitted him. After Samantha's death, another girl, Cara B., came forward and said that defendant had also molested her. She testified that in 1999, when she was 11 years old, defendant asked her to "touch his private parts" and then inserted a glass test tube into her vagina. He told her that "if I told anybody that someone could be killed."

Lizbeth V. testified that when defendant was her boyfriend he had little interest in having sex with her. He was preoccupied with pornographic movies

5

and sometimes asked her to dress in "junior style clothing." Cara B.'s father testified that in late 1999, he had been defendant's roommate. In January 2000, after defendant had moved out, he found a photograph containing child pornography in what had been defendant's bedroom.

Defendant's sister, Elvira, testified that after he had been acquitted of the molestation charges, and while they were watching a movie called "Double Jeopardy," he told her, "I could do anything I want to that little girl and I can't be charged for it because of double jeopardy."

Acting pursuant to a search warrant, investigators seized a computer from the apartment of defendant's sister, Adelita. Adelita testified that she had never accessed pornography on that computer, that her mother did not know how to use the Internet, and that defendant had had access to the computer.

An investigator specializing in computer crimes examined the computer. He described numerous "images of children engaged in" a wide variety of sexual activities that had been deleted from the computer but that he was able to recover. The parties stipulated that the images constituted child pornography. At 4:43 a.m. on July 14, 2002 (the day before Samantha's abduction), someone printed from that computer a multiple-page story involving an adult male having sex with young children.

The investigator also discovered the record of a chat room conversation between someone on that computer using the name "Girl*Lover" and a person in Finland. Both stated that they "like" girls under the age of 12 years. In response to a question about living in California, the person using the name Girl*Lover said, "I live 4 thousand feet in the mountains where you can do anything to little kids."

6

## 2. *Defense Evidence*

Defendant presented evidence seeking to raise a reasonable doubt that he had committed the crime.

A witness testified that around the time and in the area of Samantha's kidnapping, she saw a car that was not defendant's Thunderbird but was similar to the description Sarah A. gave of the abductor's car. Another witness testified that early the morning after the kidnapping, in the area where the body was found, he saw a motorcycle and a red "small S.U.V. or a pickup with a camper shell . . . and somebody at the back of it bent into it." It was unusual to see a vehicle there at that early hour. Several witnesses testified they stayed at the Comfort Inn in Temecula the night of the kidnapping and noticed nothing unusual. Defendant had checked into the hotel alone without luggage and did not appear to have a child with him. The next morning, the room in which defendant stayed seemed normal. Another witness testified that on July 18, 2002, he saw a black Honda containing two persons who acted suspiciously near the apartment complex where defendant lived.

An expert who examined maggots collected from Samantha's body opined that the maggots could not have appeared on the body until around 6:00 a.m. on July 16, 2002 (i.e., after defendant checked into the Comfort Inn). He also testified that it was possible the body could have lain where it was the previous evening without the flies that laid the maggots discovering it before it got dark, and the flies would not deposit the maggots in the dark.

Defendant presented several witnesses in an attempt to discredit the validity or significance of the DNA evidence.

Several family members testified they had seen no indication defendant was molesting any of the girls who testified he had molested them. Defendant's sister,

Elvira, testified that Lizbeth V., Catherine C.'s mother and defendant's former girlfriend, was angry with defendant and wanted to harm him.

A computer expert testified that the child pornography could have been placed in the computer to which defendant had access, and indeed could be placed in any computer, due to a "Trojan horse" virus.

### 3. Other Evidence

The prosecution presented rebuttal evidence defending the validity of the DNA evidence, and defendant presented surrebuttal evidence responding to that rebuttal evidence.

## B. Penalty Phase

### 1. Prosecution Evidence

The victim's mother and grandmother testified about the victim and the impact her death had on them and the rest of the family. The mother identified for the jury eight photographs of the victim.

### 2. Defense Evidence

Defendant presented a wide range of evidence in mitigation. Several family members presented evidence that, as defendant puts it in his brief on appeal, he "came from a family which had been impoverished, sexually, physically, and psychologically abusive, and dysfunctional for generations." In 1989, defendant's father was arrested for child abuse, and the children were removed from the family home. The father also fatally shot a man in front of defendant, for which he eventually pleaded guilty to manslaughter. Dr. Matthew Mendel and Dr. Francisco Gomez, both psychologists, testified about defendant's troubled family background and the negative impact it had on him. Other witnesses testified about defendant's good qualities.

*3. Rebuttal*

Dr. Park Dietz, a psychiatrist, testified in response to a hypothetical question that a person who did what the evidence showed defendant did is a pedophile. Pedophiles have free will and can choose whether to act on their desires by committing crimes.

## II. DISCUSSION

### A. Denial of Change of Venue

Defendant contends the court erred prejudicially, and violated various of his constitutional rights, in refusing to change venue from Orange County.

*1. Procedural Background*

Defendant moved to change venue out of Orange County, citing extensive publicity about the case, including that the sheriff had been widely quoted as saying he was "100%" sure of defendant's guilt; even then-President George Bush had commented on the case.

At a lengthy evidentiary hearing, both defendant and the prosecution presented testimony by their respective pollsters, who agreed that a high percentage of the residents of Orange County had heard of the case, but disagreed as to the significance of this circumstance. Defendant also presented testimony of an expert who opined that a change of venue was necessary.

After the hearing, the court denied the motion. It recognized the case had received substantial publicity, and that selecting a fair jury would be "time-consuming and difficult." But, referring to two other highly publicized criminal cases, it added that "fortunately, this case has taken a back seat to the Scott Peterson trial, which was recently completed, and the Michael Jackson case, which has taken center stage." It noted that Orange County "has over three million people," that defendant "is not a resident of this county," that "he has no ties to it in the sense that he was not known before this case," and that "Samantha Runnion

9

was just another young lady in this county until she was abducted." It found that these factors weigh against changing venue.

The court stated that "the obvious factor weighing in favor of change of venue is the extensive publicity that this case has generated. National television networks picked up the story and gave it significant air time. President Bush commented on the arrest of the man who killed Samantha Runnion. As demonstrated by the exhibits attached to the defense motion, the vast majority of the publicity was generated two-and-a-half years ago. The media coverage in the past year has been consistent with most death penalty cases and certainly less than other cases currently pending in this county . . . . The passage of time is another consideration. . . . This case we're on a two-and-a-half-year track. And it appears to me that the passage of time has had a significant impact on the nature and amount of publicity."

The court "accepted" the results of the defense expert's poll but not the conclusions the defense would draw from it. It found that "[a]s both sides have demonstrated, there are flaws in the surveys. Questions can be tailored to obtain the desired answers. However, the biases of these expert witnesses cannot be ignored in evaluating their testimony. The conclusions they have drawn are consistent with those biases." The court "reject[ed] the opinion that a cold calling survey is superior to voir dire in determining a person's depth of knowledge, prejudices, and common sense." For these reasons, and based on the court's experience after having conducted some 225 felony trials in the county, it believed it likely a fair jury could be selected. But the court stated the denial was "without prejudice to renewing the motion during jury selection should defense concerns that an impartial jury cannot be obtained be confirmed."

Jury selection took place in March 1995. During this process, many jurors were excused for various reasons, including exposure to publicity. Defendant

10

renewed the motion to change venue a number of times. Twice defense counsel expressed concerns about inflammatory radio coverage on station KFI during the *John and Ken Show*. The court denied each renewed motion, expressing confidence that, based on what had occurred so far in jury selection, a fair jury could be selected.

Defendant exhausted his peremptory challenges and expressed dissatisfaction with the jury that had been selected. Defense counsel said, "We are still left with a jury with only three people who haven't read or heard something about this case." She requested the court grant defendant additional peremptory challenges because she wanted to challenge six more jurors, specifically, Juror Nos. 151, 194, 201, 210, 211, and 225. The reason counsel gave for wishing to challenge them was that "all have varying degrees of exposure to publicity. Some of them had more information in the questionnaires than the court gave them." The court asked, "That's the only reason?" Counsel responded, "Right." The court then denied the motion for additional challenges.

After the alternate jurors had been selected, defendant again renewed the motion to change venue. The court again denied the motion. It explained that "what I observed in voir dire was entirely consistent with what I anticipated it would be. With one small exception, more people had name recognition of the case than I had anticipated. I think I guessed about 50 percent would not. It turns out that — I don't know if you kept percentages, but I think it was probably closer to 20 or 25 percent did not. In any case, I am satisfied that there were sufficient numbers of jurors who had not been adversely influenced by pretrial publicity to constitute a sufficient venire. We went through 150 prospective jurors. My recollection is that the ones who had the most recall of the events were excused for various and sundry reasons. The ones who were challenged for cause that were not granted had limited knowledge of the facts of the case. And it is my feeling

11

that there is a fair and impartial jury that has been impaneled. So I would deny the motion on change of venue."

### 2. *Analysis*

"On a defendant's motion, the court must order a change of venue 'when it appears that there is a reasonable likelihood that a fair and impartial trial cannot be had in the county.' (§ 1033, subd. (a); see *People v. Famalaro* (2011) 52 Cal.4th 1, 21.) On appeal from the denial of a change of venue, we accept the trial court's factual findings where supported by substantial evidence, but we review independently the court's ultimate determination whether it was reasonably likely the defendant could receive a fair trial in the county. In deciding whether to change venue, the trial court, and this court in its independent review, considers several factors, including the nature and gravity of the offense, the nature and extent of the media coverage, the size of the community, the defendant's status within the community, and the victim's prominence. On appeal, a defendant challenging the court's denial of a change of venue must show both error and prejudice, that is, that it was not reasonably likely the defendant could receive a fair trial at the time of the motion, and that it is reasonably likely he did not in fact receive a fair trial." (*People v. Rountree* (2013) 56 Cal.4th 823, 837.)

The nature and gravity of the offense are most serious, but those factors do not alone compel a change of venue. (*People v. Edwards* (1991) 54 Cal.3d 787, 807 [murder of a 12-year-old girl].) As the trial court recognized, neither the size of the community, nor the defendant's status within the community, nor the victim's prominence supported a change of venue. Defendant was not an outsider in any significant respect, and the victim was little known before her death. Although her death generated "an understandable outpouring of sympathy," she "had no particular celebrity status in the community." (*Id*. at pp. 807-808.)

12

Moreover, prospective jurors would sympathize with Samantha Runnion's fate wherever the trial was held. "The horrendous crime, not the locale of trial, evokes the sympathy." (*Id*. at p. 808.) Orange County is one of the most populous counties in California, a factor that "weighed heavily against a change of venue." (*Id*. at p. 807.)

As the trial court recognized, the extensive publicity was the factor most heavily supporting a change of venue. But, as the court also found, the publicity had dissipated over time. Trial was held two years and nine months after the crime and the initial outpouring of publicity. Other highly publicized cases had taken "center stage." The public opinion surveys suggested that within a few months of the trial the case still remained in the public consciousness. But it was reasonable for the trial court to conclude that actual voir dire — during which the court and parties could question the jurors face to face — was a more reliable way to measure the effect of pretrial publicity than a survey conducted by a person chosen by one of the parties.

Accordingly, we conclude the court did not err in deferring a final decision until jury selection. During jury selection, another factor entered the case: the *John and Ken Show* on radio station KFI, which urged a death verdict in this case during the jury selection process itself. As defendant notes, transcripts indicate the show went so far as to state that it would be "great" "to have a John and Ken stealth juror." But the court was warned about the show's activities and took steps to prevent them from tainting the actual jury, including questioning the prospective jurors about whether they had listened to the program. The radio program did not alone compel a change of venue.

But even if we were to assume it was not reasonably likely defendant could receive a fair trial at the time of the motions, defendant has not shown that it is reasonably likely he did not in fact receive a fair trial. On the contrary, this record

13

shows that he did receive a fair trial. Citing *Sheppard v. Maxwell* (1966) 384 U.S. 333, defendant contends the reasonably likely test this court has established is not the correct standard of prejudice. Rather, he argues the standard for federal constitutional error applies, and the People must prove he received a fair trial beyond a reasonable doubt. However, in *Sheppard*, the high court "concluded that Sheppard did not receive a fair trial," which required the judgment be reversed. (*Id*. at p. 335.) That court has never held the prosecution must prove beyond a reasonable doubt that a defendant received a fair trial. If a defendant did not receive a fair trial, the judgment must be reversed. But it is appropriate to use the reasonable likelihood test to determine whether he did receive such a fair trial.

Indeed, the high court has used a comparable test in analogous situations. A defendant claiming ineffective assistance of counsel must establish a "reasonable probability" of prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 694.) Even more closely analogous is the high court's test for determining whether instructional error occurred. The high court asks whether it is reasonably likely the jury applied the challenged instruction in a way that violated the Constitution. (*Estelle v. McGuire* (1991) 502 U.S. 62, 72-73 & fn. 4.) A comparable test is appropriate on appeal from the denial of a change of venue.

Defendant also contends the publicity was so pervasive, and the *John and Ken Show* so poisonous, that prejudice must be presumed and need not be established. (See generally *People v. Prince* (2007) 40 Cal.4th 1179, 1216-1218.) We disagree. The United States Supreme Court recently made clear that a "presumption of prejudice . . . attends only the extreme case." (*Skilling v. United States* (2010) 561 U.S. 358, __ [130 S.Ct. 2896, 2915] (*Skilling*) [finding pervasive publicity from the Enron scandal did not require that prejudice be presumed].)

14

This case is far different from the cases, discussed in *Skilling*, *supra*, 561 U.S. 358 [130 S.Ct. 2896], in which the high court did find a presumption of prejudice. In *Rideau v. Louisiana* (1963) 373 U.S. 723, three times shortly before trial in the small community (Calcasieu Parish) where the trial was held, a local television station had broadcast the defendant's confession, taken before the defendant was represented by counsel, which had been filmed without the defendant's consent. "What the people of Calcasieu Parish saw on their televisions sets was Rideau, in jail, flanked by the sheriff and two state troopers, admitting in detail the commission of the robbery, kidnapping, and murder, in response to leading questions by the sheriff." (*Id*. at p. 725.) It was estimated that over a third of the community had watched at least one of the televised confessions, and three actual jurors had done so. (*Id*. at pp. 724-725.) The high court found that the "kangaroo court proceedings" in which "the people of Calcasieu Parish saw and heard, not once but three times, a 'trial' of Rideau in a jail, presided over by a sheriff, where there was no lawyer to advise Rideau of his right to stand mute," violated the defendant's right to a fair trial. (*Id*. at pp. 726-727.)

The *Skilling* court explained that in *Estes v. Texas* (1965) 381 U.S. 532, "extensive publicity before trial swelled into excessive publicity during preliminary court proceedings as reporters and television crews overran the courtroom and 'bombard[ed] . . . the community with the sights and sounds of' the pretrial hearing. The media's overzealous reporting efforts . . . 'led to considerable disruption' and denied the 'judicial serenity and calm to which [Billie Sol Estes] was entitled.' " (*Skilling*, *supra*, 561 U.S. at p. __ [130 S.Ct. at p. 2914].) Another high court opinion described the trial in *Estes* as having "been conducted in a circus atmosphere." (*Murphy v. Florida* (1975) 421 U.S. 794, 799.)

15

The *Skilling* court discussed the third case.  "Similarly, in *Sheppard v. Maxwell*, 384 U.S. 333 (1966), news reporters extensively covered the story of Sam Sheppard, who was accused of bludgeoning his pregnant wife to death. '[B]edlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom,' thrusting jurors 'into the role of celebrities.'  *Id.* at 353, 355.  Pretrial media coverage, which we characterized as 'months [of] virulent publicity about Sheppard and the murder,' did not alone deny due process, we noted.  *Id.* at 354.  But Sheppard's case involved more than heated reporting pretrial:  We upset the murder conviction because a 'carnival atmosphere' pervaded the trial, *id.* at 358."  (*Skilling*, *supra*, 561 U.S. at p. __ [130 S.Ct. at p. 2914].)

This case, like *Skilling*, does not present such an "extreme case."  (*Skilling*, *supra*, 561 U.S. at p. __ [130 S.Ct. at p. 2915].)  There was no circus or carnival atmosphere, no spectacular confession repeatedly televised in a small community and seen by three actual jurors.  Although there was indeed much publicity about this case, especially around the time of the crime, that alone did not make this such an extreme case.  " '[P]retrial publicity — even pervasive, adverse publicity — does not inevitably lead to an unfair trial.' "  (*Id.* at p. __ [130 S.Ct. at p. 2916].)  In *Sheppard v. Maxwell*, *supra*, 384 U.S. 333, the high court suggested that if there is "a reasonable likelihood" that publicity "will prevent a fair trial, the judge . . . continue the case until the [publicity] abates."  (*Id.* at p. 363.)  Here, trial was held some two years, nine months after the crime.

The efforts of the *John and Ken Show*, although a concern, do not themselves make this an extreme case.  We see no reason to assume that a court, forewarned, cannot control possible prejudice from a single radio station, one of many in a major metropolitan area.  As the *Skilling* court noted, the high court "decisions have rightly set a high bar for allegations of juror prejudice due to

16

pretrial publicity. [Citations.] News coverage of civil and criminal trials of public interest conveys to society at large how our justice system operates. And it is a premise of that system that jurors will set aside their preconceptions when they enter the courtroom and decide cases based on the evidence presented." (*Skilling*, *supra*, 561 U.S. at p. __, fn. 34 [130 S.Ct. at p. 2925, fn. 34].) We will not presume prejudice; defendant has to show it.

He has not shown prejudice. In determining whether defendant in fact received a fair trial, "we consider the jury voir dire to determine whether the jurors may have been prejudiced by the pretrial publicity surrounding the case, bearing in mind that no presumption of a deprivation of due process of law arises from juror exposure to publicity concerning the case." (*People v. Proctor* (1992) 4 Cal.4th 499, 526-527.) Here, the record shows the jurors were not prejudiced.

After the main jury had been selected, defense counsel stated she wished to peremptorily challenge six other jurors, specifically Juror Nos. 151, 194, 201, 210, 211, and 225. In this appeal, defendant asserts that all six "had acknowledged varying degrees of exposure to the publicity. These jurors had acknowledged prejudging [his] guilt based upon information they had received from the media, beyond the information provided to them by the court . . . ." The record does not support the assertion.

The jury questionnaires the prospective jurors were directed to fill out provided basic information about the facts of the case, then asked whether the prospective jurors had been exposed to publicity regarding the case.

Juror No. 151 stated on the questionnaire that he had "heard [of the case] on TV" but knew nothing about defendant and had no opinion about the case. During voir dire, he said that from "TV, the name was familiar," but he could recall nothing specific, and had formed no opinion, about the case.

17

Juror No. 194 stated on the questionnaire that, a "long while" previously, she had viewed "television news, general facts of the case, an interview of the mother of Samantha Runnion." But she recalled "nothing" about defendant and had formed no opinion regarding his guilt. During voir dire, she said she could recall nothing specific about the case beyond the information already provided and reiterated that she had formed no opinion about it.

Juror No. 201 stated on the questionnaire that she had heard of the case "briefly on the news" but knew nothing about defendant and had formed no opinion about the case. During voir dire, she said she had heard only "what was on the news" but had not heard enough to form an opinion.

Juror No. 210 stated on the questionnaire that the juror had "read local newspaper reports (e.g., LA Times) and saw reports on local TV news," but knew about defendant "only that he was arrested." The juror had formed no opinion about the case. During voir dire, the juror remarked about hearing of the crime "just early on when the event took place in the newspaper and TV," but nothing had jogged the juror's memory, and the juror had no opinion regarding the case.

Juror No. 211 stated on the questionnaire that the juror had viewed "basically what was mentioned above [in the questionnaire] from TV news coverage" and knew about defendant "just that he was charged w/ the crime." The juror had formed no opinion about the case. During voir dire, the juror said, "I didn't really recall any details [about the case] though. I have thought about it more since I've been here." The juror had no opinion at all about the case.

Juror No. 225 stated on the questionnaire, "I recall reading of Samantha's murder and not much more." He knew nothing about defendant and had formed no opinion about the case. During voir dire, the juror described his advance knowledge of the case as "sketchy" and said he had not formed any opinion about it. On questioning by defense counsel, he said that Samantha Runnion's death was

18

"heart wrenching," but added, "I have not made a judgment to anyone's guilt." He said his emotional reaction to the publicity would not make him more anxious to convict than in any other case. When asked whether he listened to the *John and Ken Show* on KFI, he responded that he carpools and "there are times I think they have it on." But he added that would not be a problem because he would just ask them to change the channel.

In sum, this record shows these six jurors had no knowledge of the case beyond the information they received in the selection process, and none had a preexisting opinion about it. Although a preexisting opinion is not disqualifying if the juror can set the opinion aside and decide the case solely on the evidence presented in court (*People v. Rountree*, *supra*, 56 Cal.4th at p. 840), these jurors did not even present that issue. It is true that one of the jurors said he found the victim's death "heart wrenching." But that circumstance has nothing to do with the locale of the trial and everything to do with the facts of the case. Any person familiar with the facts, as all jurors anywhere would inevitably become, could find Samantha's death "heart wrenching." The question is whether that person could fairly judge guilt. Nothing suggests this juror, or any of the others, could not do so.

As defendant notes, one of the actual jurors said he had recently listened to the *John and Ken Show*. This juror was *not* one of those defendant had wished to excuse at trial. And for good reason. The juror also said he had no knowledge of the case, he listened to "a lot of different programs," he had listened to the *John and Ken Show* for a while even though he disagreed "with 99 percent of it," and he had never listened to anything about this case. He described John and Ken as "being loud and screaming" and made clear the show did not and would not influence him.

19

Defendant also notes that the jury convicted him of all charges and found true both of the charged special circumstances. We and the United States Supreme Court have sometimes cited a split verdict, with some portions favoring the defendant, as further indicating the jury was fair and impartial. (See *Skilling, supra*, 561 U.S. at p. __ [130 S.Ct. at p. 2923]; *People v. Harris* (2013) 57 Cal.4th 804, 831.) It is true that this additional indication of jury impartiality is lacking here. But defendant was charged with only four counts: kidnapping, two counts of a lewd and lascivious act, and murder. The evidence showed beyond question that the perpetrator of this crime did kidnap Samantha, did commit at least two lewd and lascivious acts on her (the vaginal sexual assault and the anal sexual assault), and did murder her under the two alleged special circumstances. Once the jury found that defendant was the perpetrator — a finding the evidence strongly supports — conviction on all counts and a true finding of both special circumstances was virtually inevitable. The verdict does not suggest bias.

The trial judge was satisfied the actual jury was fair. "When pretrial publicity is at issue, 'primary reliance on the judgment of the trial court makes [especially] good sense' because the judge 'sits in the locale where the publicity is said to have had its effect' and may base her evaluation on her 'own perception of the depth and extent of news stories that might influence a juror' [Citation.] . . . [¶] Reviewing courts are properly resistant to second-guessing the trial judge's estimation of a juror's impartiality, for that judge's appraisal is ordinarily influenced by a host of factors impossible to capture fully in the record — among them, the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty. [Citation.] In contrast to the cold transcript received by the appellate court, the in-the-moment *voir dire* affords the trial court a more intimate and immediate basis for assessing a venire member's fitness for jury service." (*Skilling*, *supra*, 561 U.S. at p. __ [130 S.Ct. at p. 2918].) Even the

20

cold record here fully supports the trial judge's estimation of the jury's impartiality.

This record presents no reason to find a reasonable likelihood that defendant did not receive a fair trial before impartial jurors. "Stated slightly differently, we are confident the guilt and penalty verdicts were due to the evidence presented at trial and not to a biased jury or the failure to change venue." (*People v. Rountree*, *supra*, 56 Cal.4th at p. 841.)

### B. Denial of Additional Peremptory Challenges

Defendant contends the court erred in denying his request for additional peremptory challenges after he exhausted his statutory allotment of challenges.[3] We disagree. "[T]o establish the constitutional entitlement to additional peremptory challenges argued for here, a criminal defendant must show at the very least that in the absence of such additional challenges he is reasonably likely to receive an unfair trial before a partial jury." (*People v. Bonin* (1988) 46 Cal.3d 659, 679.) As discussed above regarding defendant's change of venue contention, he has failed to make this showing.

In this appeal, defendant asserts that when defense counsel requested the additional peremptory challenges, she said "she wished to excuse six jurors she believed could not be fair and impartial in light of (1) their exposure to the inflammatory publicity, (2) their personal identification with the victim and her

---

[3] With respect to this and other claims on appeal, defendant argues that the asserted error also violated various of his constitutional rights. The constitutional claims do not invoke facts or legal standards different from those defendant asked the trial court to apply but merely assert that the alleged errors were also constitutional violations. Because we find no error, we necessarily also find no constitutional violation. Accordingly, we provide no separate constitutional discussion. (See *People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17.)

21

mother, and/or (3) their sympathy with close friends and relatives who had been victims of sexual assaults, even though they might not be excusable for cause." The record does not support the assertion. When defense counsel requested additional challenges, the court specifically asked which jurors she wanted to challenge and why she wanted to challenge them. After providing the jurors' numbers, counsel said, "All have varying degrees of exposure to publicity. Some of them had more information in the questionnaires than the court gave them." When the court asked if that was the only reason, counsel responded that it was.

As discussed above, the six jurors in question professed to have had very little exposure to publicity and stated that they had formed no opinion regarding the case. The trial court assessed their states of mind, finding that they were able to render a fair verdict. Because the questionnaire responses by these jurors, and their answers on voir dire, comprise substantial evidence supporting the trial court's rulings regarding their impartiality, we defer to the trial court's conclusion that the six identified prospective jurors could be fair and impartial. The mere fact that defendant wished to peremptorily challenge those jurors does not establish that any of them were biased. (See *Skilling*, *supra*, 561 U.S. at p. __ [130 S.Ct. at pp. 2924-2925] [reaching a similar conclusion regarding the defendant's similar objection to six specific jurors that he had wanted to challenge peremptorily].) Under the circumstances, defendant has not demonstrated that additional peremptory challenges were necessary to secure his right to a fair trial. No violation of his constitutional rights is apparent.

### C. Admitting Evidence of Other Crimes

Defendant contends the court erred in admitting evidence that he had sexually molested three girls. He had been charged with and acquitted of crimes concerning two of the girls. The prosecution offered, and the trial court

specifically admitted, the evidence under Evidence Code section 1108. The court found that its "probative value is extremely high" and exercised its discretion under Evidence Code section 352.

Evidence Code section 1108, subdivision (a), provides: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." "[T]he Legislature's principal justification for adopting section 1108 was a practical one: By their very nature, sex crimes are usually committed in seclusion without third party witnesses or substantial corroborating evidence. The ensuing trial often presents conflicting versions of the event and requires the trier of fact to make difficult credibility determinations. Section 1108 provides the trier of fact in a sex offense case the opportunity to learn of the defendant's possible disposition to commit sex crimes." (*People v. Falsetta* (1999) 21 Cal.4th 903, 915.) The need for such evidence is especially compelling when the sexual assault victim was killed and cannot testify. (*People v. Story* (2009) 45 Cal.4th 1282, 1293.)

Defendant was charged with a sexual offense both because he was charged with committing lewd and lascivious acts on a child under the age of 14 and because he was charged with murder under the special circumstance of murder while committing the lewd and lascivious acts. (See *People v. Story*, *supra*, 45 Cal.4th at pp. 1290-1292.) Accordingly, evidence of other sexual crimes, such as the evidence admitted in this case, is admissible under Evidence Code section 1108.

"[Evidence Code s]ection 1108 preserves the trial court's discretion to exclude evidence under [Evidence Code] section 352 if its prejudicial effect substantially outweighs its probative value. [Citations.] In deciding whether to

23

exclude evidence of another sexual offense under section 1108, 'trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense.' (*People v. Falsetta*, *supra*, [21 Cal.4th] at p. 917.) Like any ruling under section 352, the trial court's ruling admitting evidence under section 1108 is subject to review for abuse of discretion." (*People v. Story*, *supra*, 45 Cal.4th at pp. 1294-1295.)

The court did not abuse its discretion in this case. That defendant had been acquitted of charges regarding two of the girls did not prevent admitting the evidence in this case. "Both this court and the United States Supreme Court have held that principles of double jeopardy, including its collateral estoppel component, permit the admission of otherwise proper evidence of a prior crime even if the person had been entirely acquitted of that prior crime. (*Dowling v. United States* (1990) 493 U.S. 342, 348-349; *People v. Santamaria* (1994) 8 Cal.4th 903, 921.) This is so because the defendant must be found guilty beyond a reasonable doubt of a crime to be convicted of it, but other crimes evidence need be proven only by a preponderance of the evidence. (*Dowling*, at pp. 348-349; *Santamaria*, at p. 921 . . . .)" (*People v. Steele* (2002) 27 Cal.4th 1230, 1245, fn. 2.)

The evidence of the other sexual offenses was, as the trial court found, extremely probative. They were sex crimes against young girls, suggesting defendant was a pedophile who committed the crimes against the young female

24

victim in this case. The evidence strongly corroborated the other evidence of defendant's guilt of the charged offenses. This circumstance brings the evidence precisely within the primary purpose behind Evidence Code section 1108. Moreover, in addition to the force of the evidence to show defendant has a disposition to commit sex crimes against young girls, the evidence was particularly probative in light of statements defendant made after his acquittal of some of those crimes — specifically, the evidence that defendant told his sister, "I could do anything I want to that little girl and I can't be charged for it because of double jeopardy," and the chat room conversation in which defendant said, "I live 4 thousand feet in the mountains where you can do anything to little kids." These statements indicated that defendant intended to continue committing sex offenses against young girls, thus greatly strengthening both the evidence that defendant did commit the earlier crimes and their tendency to show defendant committed the charged crime.

The other crimes were neither remote nor particularly inflammatory when compared with the facts of the charged crime. Additionally, although defendant had previously been acquitted of the crimes against two of the girls, the evidence at this trial that he committed those crimes was much stronger. A third girl came forward with similar testimony. Moreover, as explained, defendant's statements strengthened the force of the evidence. Given all of the circumstances, the court acted within its discretion in admitting the evidence.

Defendant argues, as he did at trial, that admitting the evidence of the crimes for which he had been acquitted would prejudice him at a potential penalty phase. By statute, "in no event shall evidence of prior criminal activity be admitted for an offense for which the defendant was prosecuted and acquitted." (§ 190.3, 3d par.) Thus, evidence of the crimes against the two girls for which he had been prosecuted and acquitted would not be admissible in aggravation at the

25

penalty phase.  This was a legitimate concern, and one the court and parties were fully aware of at trial.  In exercising its discretion under Evidence Code section 352, the court said that "as to the death penalty aspect, I think that issue can be dealt with.  Every day we ask jurors to disregard certain things, evidence that is stricken."

At the penalty phase, the court ruled that the jury could consider in aggravation evidence of the crimes against Cara B., for which defendant had not been tried and acquitted, and that the prosecutor could argue, as a circumstance of the charged offense, that the prior prosecution and acquittal were relevant to show motive and premeditation regarding the charged crime.  Otherwise, it ruled that the jury could not consider in aggravation the evidence of the crimes as to the other two girls.  It instructed the jury, that "with the exception of the evidence related to [Cara B.], such evidence [of the other sexual offenses] may not be used by you to determine the penalty in this case.   However, you may consider the fact that the defendant was charged with and tried for a prior sexually related offense . . . as circumstances of the crime, if you determine that such activity relates to motive or intent for the homicide in this case."

Defendant does not contend that this instruction itself violated section 190.3, but he argues that, given section 190.3's prohibition, the court should not have admitted at the guilt phase the evidence regarding the two girls for which he had been acquitted.  We disagree.  That the sexual offenses as to two of the girls would not be admissible in aggravation as other crimes evidence at a penalty phase was a relevant factor for the trial court to consider, as it did, in exercising its discretion.  But it did not deprive the court of discretion to conclude that the evidence should nonetheless be admitted at the guilt phase.

Section 190.3 itself so indicates.  Immediately following the sentence quoted above that prohibits admission at the penalty phase of evidence of criminal

26

activity for which the defendant had been prosecuted and acquitted, that section provides: "The restriction on the use of this evidence is intended to apply only to proceedings pursuant to this section and is not intended to affect statutory or decisional law allowing such evidence to be used in any other proceedings." (§ 190.3, 3d par.) Section 190.3 concerns only the penalty phase of trial, not the guilt proceeding. Thus, this sentence evinces the intent not to restrict evidence of other crimes at the guilt phase if otherwise admissible, notwithstanding the fact the evidence may not be used in aggravation at the penalty phase.

Accordingly, we conclude the court acted within its discretion in admitting the evidence under Evidence Code section 1108. The parties also debate whether the evidence would additionally have been admissible under some other provision of law. We need not consider the question because the evidence was offered and properly admitted under section 1108. (See *People v. Story*, *supra*, 45 Cal.4th at p. 1295.)

### D.  Admitting Crime Scene Photographs and Evidence of Child Pornography

Defendant contends the court erred in admitting, over objection, photographs of the crime scene and the evidence regarding the child pornography found on the computer to which he had access.

#### 1.  Crime Scene Photographs

At a hearing held before the evidentiary portion of trial, the prosecutor stated he did not seek to introduce any autopsy photographs, but he sought to introduce six photographs of the crime scene that depict the condition of the body when it was found. The court excluded two of the proffered photographs but ruled the prosecutor could admit the other four. Those four photographs were introduced at trial.

27

"The admission into evidence of photographs lies within the trial court's discretion and will not be disturbed absent an abuse of that discretion." (*People v. Rountree*, *supra*, 56 Cal.4th at p. 852.) In this case, the court did not abuse its discretion but carefully exercised it. The prosecution offered no autopsy photographs and only six crime scene photographs. In the exercise of its discretion, the trial court excluded two of those photographs. We have viewed the photographs the court admitted. They are disturbing, as photographs of murder victims usually are. They show, for example, the injuries the victim suffered to her vagina and anus. But, as we have noted many times, "murder is rarely pretty" and "photographs in a murder case are generally unpleasant." (*Ibid.*) The photographs were highly relevant to the cause of death and, especially, to whether defendant committed lewd and lascivious acts on the child and murdered her in the course of doing so. The trial acted within its discretion in excluding some photographs and admitting others.

### 2. Child Pornography

The prosecutor also sought to introduce evidence of the child pornography found on the computer. Defendant objected to all of this evidence but also, more specifically, argued that the pornographic materials themselves were unduly prejudicial. He offered to stipulate that what was found on the computer was, in fact, child pornography. Because of this offer, the court found that "the prejudicial effect from the inflammatory nature of the photographs is such that it outweighs the probative value . . . ." It excluded the photographs themselves but permitted the witness to describe what he found on the computer. Accordingly, the jury heard the evidence summarized in the factual recitation in part I.A.1.b., *ante*.

Defendant contends the court erred in permitting even this limited evidence that he possessed child pornography. We disagree. Evidence that defendant

28

possessed child pornography, and that the day before the murder he printed out a story involving an adult male having sex with young children, was probative of defendant's intent to commit lewd acts on the young murder victim in this case. The court took steps to minimize any prejudicial effect by excluding the pornographic materials themselves and only permitting a witness to describe those materials.

In *People v. Memro* (1995) 11 Cal.4th 786, 864, the trial court admitted magazines and photographs containing "sexually explicit stories, photographs and drawing of males ranging in age from prepubescent to young adult." We found no abuse of discretion in admitting the evidence because "the photographs were admissible to show defendant's intent to molest a young boy in violation of section 288 [committing a lewd and lascivious act]." (*Ibid*.) We explained that "the photographs, presented in the context of defendant's possession of them, yielded evidence from which the jury could infer that he had a sexual attraction to young boys and intended to act on that attraction." (*Id*. at p. 865; see also *People v. Page* (2008) 44 Cal.4th 1, 40.) Similarly, we find no abuse of discretion here.

### E. Admitting Victim Impact Evidence

During the penalty phase, the victim's mother and grandmother presented brief victim impact evidence. Over objection, and after reviewing them, the court admitted eight photographs of the victim while alive. They were presented through the mother's testimony.

Within limits, as when it invites an irrational response from the jury, the prosecution may present evidence of the impact of the capital crime on loved ones and the community. (See *People v. Rountree*, *supra*, 56 Cal.4th at p. 858.) The evidence here was not particularly emotional and was presented very quickly.

Presenting it consumed a small fraction of the time devoted to defendant's case in mitigation. This testimony came well within permissible limits. (*Ibid.*)

Defendant argues primarily that the court should not have admitted the photographs of the victim while alive. He especially objects to two photographs of her in Halloween costumes dressed as a princess and an angel. However, admitting the still photographs also came within the court's discretion. (*People v. Rountree*, *supra*, 56 Cal.4th at p. 858; see *People v. Zamudio* (2008) 43 Cal.4th 327, 365-368 [14-minute videotaped montage of photographs properly admitted].)

## F. Cumulative Prejudice

Defendant contends the cumulative effect of the asserted errors was prejudicial. However, there was no error to accumulate.

## G. Other Contentions

Defendant reiterates many challenges to California's death penalty law that we have repeatedly rejected. We see no reason to revisit our previous decisions.

Section 190.2 is not impermissibly broad. (*People v. Beames* (2007) 40 Cal.4th 907, 933-934.) "Section 190.3, factor (a) (circumstances of the crime) is not applied too broadly and does not result in the arbitrary and capricious imposition of the death penalty." (*People v. Rountree*, *supra*, 56 Cal.4th at p. 862.) "Except regarding evidence of other crimes, jurors need not find aggravating factors true beyond a reasonable doubt; no instruction on burden of proof is needed; the jury need not achieve unanimity except for the verdict itself; and written findings are not required." (*People v. Livingston* (2012) 53 Cal.4th 1145, 1180.) "Intercase proportionality review is not required." (*People v.*

*Rountree*, *supra*, at p. 862.)[4] "Use of prior unadjudicated criminal activity in aggravation [is] proper." (*People v. Livingston*, *supra*, at p. 1180.) "Section 190.3's use of adjectives such as 'extreme' and 'substantial' in describing mitigating circumstances does not impermissibly limit the jury's consideration of mitigating factors." (*People v. Rountree*, *supra*, at p. 863.) "The trial court was not constitutionally required to inform the jury that certain sentencing factors were relevant only in mitigation, and the statutory instruction to the jury to consider 'whether or not' certain mitigating factors were present did not impermissibly invite the jury to aggravate the sentence upon the basis of nonexistent or irrational aggravating factors." (*People v. Morrison* (2004) 34 Cal.4th 698, 730.) "The California death penalty scheme does not violate equal protection by treating capital and noncapital defendants differently." (*People v. Livingston*, *supra*, at p. 1180.) "Use of the death penalty does not violate international law and is not unconstitutional." (*Ibid*.)

---

[4] We do provide *intracase* proportionality review on request. (*People v. Rountree*, *supra*, 56 Cal.4th at p. 860.) Defendant does not specifically request such review, but it would not aid him. The crime of this case, kidnapping and then brutally killing a five-year-old child for sexual enjoyment, was truly appalling. And defendant was solely responsible for that crime. "The sentence defendant received is not disproportionate to his personal culpability. It does not shock the conscience." (*Id*. at p. 862.)

31

### III. CONCLUSION

We affirm the judgment.

CHIN, J.

WE CONCUR:

CANTIL-SAKAUYE, C. J.
BAXTER, J.
WERDEGAR, J.
CORRIGAN, J.
LIU, J.
REARDON, J. *

---

* Associate Justice of the Court of Appeal, First Appellate District, Division Four, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Avila

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S135855
**Date Filed:** June 30, 2014

_____

**Court:** Superior
**County:** Orange
**Judge:** William R. Freeberg

_____

**Counsel:**

Jonathan P. Milberg, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney, Robin Urbanski and Bradley A. Weinreb, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Jonathan P. Milberg
225 South Lake Avenue, 3rd Floor
Pasadena, CA  91101-3009
(626) 685-8910

Bradley A. Weinreb
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA  92101
(619) 645-2290