Filed 3/4/22  P. v. Brunson CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Amador)

----

| | |
|---|---|
| THE PEOPLE, | C084075 |
| Plaintiff and Respondent, | (Super. Ct. Nos. 15CR2344601, |
| v. | 15CR2344602) |
| BRIAN REED BRUNSON et al., | |
| Defendants and Appellants. | |

A gathering of three acquaintances devolved into a robbery, beating and kidnapping.  Myron Hughes planned to rent a room from defendant Brian Reed Brunson; defendant Lewis Angel Rhodes was another prospective tenant.  After an evening of drinking and drugs, an altercation ensued with Brunson and Rhodes overpowering Hughes.  The duo put Hughes in a car intending to dump his body somewhere, but had second thoughts and instead took him to the hospital.  The defendants later claimed Hughes tried to rob them.  A jury found defendants guilty of torture, kidnapping, robbery, assault with a deadly weapon, dissuading a witness, criminal threats, false imprisonment,

1

sale of methamphetamine, and possession of methamphetamine. Defendants appeal, contending evidentiary and sentencing error.

We will direct the trial court to strike or modify various components of defendants' sentences and correct an apparent clerical error in the abstracts of judgment regarding defendants' indeterminate sentences, as further discussed herein. The case is remanded for the trial court to consider whether to strike defendants' prior serious felony convictions for purposes of enhancement under section 667, and to exercise its discretion in deciding which terms to stay pursuant to section 654. The judgments are otherwise affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

An information charged defendants with 10 felonies: count I, attempted premeditated murder (Pen. Code, §§ 664, 187, subd. (a));[1] count II, torture (§ 206); count III, kidnapping (§ 207, subd. (a)); count IV, first degree robbery (§ 211); count V, assault with a deadly weapon (§ 245, subd. (a)(1)); count VI, dissuading a witness by force or threat (§ 136.1, subd. (c)(1)); count VII, criminal threats (§ 422, subd. (a)); count VIII, false imprisonment by violence (§ 236); count IX, sale or transportation of methamphetamine (Health & Saf. Code, § 11379, subd. (a)); and count X, possession for sale of methamphetamine (Health & Saf. Code, § 11378).

All the counts, with the exception of counts V, IX and X, alleged personal use of a deadly weapon, a knife (§ 12022, subd. (b)(1)), and with the exception of counts IX and X, personal infliction of great bodily injury (§ 12022.7, subd. (a)). All the counts, with the exception of counts IX and X, alleged defendants committed a hate crime in concert. (§ 422.75, subd. (b).) The information also alleged defendants had suffered a strike conviction and a prior serious felony conviction. (§§ 667, subds. (b)-(j), 1170.12, subd.

---

[1]     Undesignated statutory references are to the Penal Code.

2

(b), 667, subd. (a).) In addition, the information alleged Rhodes had served four prior prison terms. (§ 667.5, subd. (b).) In connection with counts IX and X, the information alleged Rhodes had a prior drug sale conviction. (Health & Saf. Code, § 11370.2, subd. (c).)

Defendants entered pleas of not guilty. Evidence of the following facts was adduced at trial.

*Setting the Stage*

Hughes met Rhodes when they were both in prison in the 1990s. The day after Hughes' release, in April 2015, he got together with Rhodes and they bought beer. They met up with Brunson and drove in his truck to buy drugs.

When they arrived at the purchase site, Brunson gave Rhodes money and Rhodes left and returned with methamphetamine. They also purchased a scale and pipes. Brunson weighed the methamphetamine and gave some to Rhodes. Rhodes gave some to Hughes and two other friends. After going to Rhodes' place to get syringes, Brunson invited Rhodes and Hughes back to his place to look at rooms they were planning to rent.

After they arrived, Brunson left and said he would return with some women. He returned with a woman, some beer, and some brandy. Hughes and the woman went outside to smoke. Brunson went outside and talked to Hughes, then returned inside and began rapping with Rhodes.

Later, Brunson and Rhodes sat on the couch whispering. Brunson suddenly became hostile towards Hughes. The trio had been drinking and using methamphetamine.

*The Altercation*

Around 1:30 a.m., another man and woman came to the house. Brunson asked them to take the first woman home and they left with her. Rhodes told Brunson that the

3

woman who had just left was not the same person who had come to the house earlier. Brunson said she was and they began to argue.

Hughes went toward the bathroom, but Brunson said, "Wait a minute. Hold up. We going to get to the bottom of this." Angrily, Brunson told Hughes to empty his pockets. Hughes did so. Brunson told Hughes to take off his clothes. Hughes again complied.

Brunson suspected Hughes was a police officer because Hughes' key chain had a star that resembled a badge. Hughes denied being a cop and Brunson accused him of trying to set him up. Brunson called Hughes a "fucking nigger." Hughes is African-American; Brunson and Rhodes are White. Rhodes took Hughes' money and broke his cell phone. Brunson continued to shout racial insults.

Rhodes grabbed a knife and stabbed Hughes in the back. Hughes turned and swung at Rhodes. Brunson punched Hughes in the head and Brunson and Rhodes jumped on Hughes. Hughes fled to the kitchen with both Brunson and Rhodes in pursuit, kicking and hitting Hughes. Brunson grabbed a second knife and held Hughes by the throat. Rhodes tried to put something that was red and black and "looked like a rope" around Hughes' neck.

Hughes resisted and Brunson stabbed him in the back and side. Hughes bit Brunson in the chest. They fell and Rhodes kicked Hughes in the head. Brunson climbed on top of Hughes and held a knife to his neck. Rhodes then sprayed something on Hughes and tried to set him on fire.

*The Aftermath*

Hughes testified he remained pinned down for two to three hours. Brunson then forced Hughes to wipe up his blood with cleaning supplies and a towel. Brunson and Rhodes discussed how to "get rid of this nigger." Brunson then told Hughes to get dressed and tied Hughes' wrists together behind his back with a belt.

Hughes begged to be taken home. Rhodes replied, "Don't worry about it. You're not going to make it home." Brunson hit Hughes in the face, breaking his nose. Brunson told Hughes that if he died, Brunson would bury him in the backyard and urinate on him. Brunson told Hughes "You ain't going to make it out of here."

Rhodes asked Brunson what they should tell the police. Brunson said, "I'll tell them this fuckin' nigger tried to rob me." Rhodes agreed to this stratagem.

Rhodes and Brunson decided to record a statement by Hughes, holding up a recording device and telling him to admit he tried to rob them. Fearing for his life, Hughes complied. Hughes stated he robbed them because he was an addict. A recording of the statement was played for the jury. Defendants took items and wiped them on Hughes' hands to make it appear he had handled them.

Brunson did not want Hughes to die in his house, so Brunson and Rhodes dragged him outside and put him in Brunson's truck. Witnesses saw the truck leave around 4:00 in the morning.

Brunson told Rhodes to drive to a location where they could dump Hughes' body. However, as they drove, Brunson began to worry that the woman who had been at his house would tell police Hughes had been there, and they would be arrested. Rhodes told Brunson they should say Hughes attempted to rob them, since they had his confession on tape.

Brunson told Rhodes to drive to the hospital. When the truck stopped, Brunson told Hughes, "This is your lucky day, nigger. You better keep your fuckin' mouth shut."

*At the Hospital*

Rhodes told the emergency room clerk that someone tried to rob them. Brunson told the clerk he had been stabbed and another person in the car had been injured.

The clerk informed a nurse, who went out to the car. The nurse saw Hughes standing between defendants, his wrists bound by a belt and his pants down to his ankles. Hughes shuffled into the hospital and was placed in a wheelchair.

Hughes' nose was bleeding and appeared broken. He also bled from chest wounds and his face was scratched. Hughes' clothes were covered in blood. He told the nurse, "I didn't try to rob them," and "I thought they were going to kill me." Hughes said he had been pretending to be dead in the truck.

Hughes stood up and a bag filled with a white substance fell out of his lap. Hughes said, "We were doing meth." A second bag containing a crystalline substance was found under Hughes' leg. Residue on Hughes' neck and shoulder appeared to be methamphetamine.

The treating physician stated Hughes suffered multiple stab wounds. The wounds on his neck and chest could have been life-threatening. The physician observed stab wounds to Hughes' neck and under his chin and contusions to his head, neck, chest, and extremities. Hughes' nose was broken. Hughes' blood alcohol level was .07 percent but his toxicology test was negative for drugs.

Officers arrested Brunson and Rhodes outside the hospital that morning. Rhodes' shirt was bloody and Brunson's pants were bloody. Brunson had $235.25 in cash and an ID in Hughes' name in his pocket.

*Search of Brunson's Residence*

Officers searched Brunson's residence and found blood on concrete outside the house, inside the front door, and between the living room and dining room. They found two knives, a dog shock collar, and a black leather belt. On a table near the couch, the officers found a "sound board," which ultimately yielded an audio file of voices arguing. The file was played to the jury.

6

On the dining room table, officers found a digital scale and loose methamphetamine. Nearby they found additional methamphetamine and plastic baggies. Another 8.2 grams of methamphetamine were strewn across the entryway, next to a broken methamphetamine pipe. In total, officers retrieved 14.8 grams of methamphetamine from the residence. The baggies found on Hughes at the hospital yielded 24 grams of methamphetamine.

In the opinion of a sheriff's department expert, the quantity of drugs, the scale, and the packaging materials were evidence the methamphetamine was possessed for sale. When they were arrested, both Rhodes and Brunson had methamphetamine in their blood.

Officers also found blood in Brunson's truck, on the tarps covering the rear seat, and on the rear floorboard. Blood was also smeared on the passenger side door. There was blood on the dog collar, which a DNA test revealed matched Hughes' DNA profile. The blood on the shock device contained a mixture of DNA, some belonging to Hughes. Brunson was excluded as a possible donor, but Rhodes was not. The blood on the knives also matched Hughes' DNA profile.

*Hughes' Mental Health*

Hughes testified he has been diagnosed with schizoaffective bipolar type two and posttraumatic stress disorder (PTSD). He takes several psychiatric medications and has been hospitalized frequently under Welfare and Institutions Code section 5150.

Hughes suffers from auditory hallucinations and suicidal depression, which are controlled by the medications. Since he becomes aggressive and hostile if he doesn't take his medications, he is careful to take them. Hughes told the doctors who had previously treated him that he heard voices telling him to kill people; he also heard voices telling him to harm himself.

7

Hughes testified he drank vodka and smoked methamphetamine the day of the incident. However, Hughes stated he was not intoxicated or delusional that day and that he had taken his medications. According to Hughes, his memory of events was "absolutely clear."

Hughes spent time in prison for robbery in 1981 and 1984. In 1994 he spent time in prison for false imprisonment and misdemeanor battery.

*Defense Case*

Brunson

Brunson presented testimony of a friend, an African-American, who has known him for over 10 years. The friend stated he did not believe Brunson was prejudiced against African-Americans.

Rhodes

Sheriff's deputy Ronald Milton testified that in 2015 he took Hughes into custody for mental evaluation three times.

In February 2015, a liquor store security guard reported Hughes was involved in a fight. Deputy Milton found Hughes angry, irrational, and hostile to the paramedics who treated him. Hughes tried to attack a bystander who made a comment. After Milton handcuffed Hughes, Hughes called an African-American sheriff's deputy "the N word and stated he wanted to beat him up."

A few weeks before this incident, Hughes' father called 911. Hughes had a knife and was threatening to kill his father. When Deputy Milton and other officers arrived at the residence, Hughes was agitated and aggressive. He refused to come outside, instead running upstairs, locking himself in a room, and yelling that he wanted the police to shoot him.

Another incident took place shortly afterwards, again at Hughes' parents' house. Deputy Milton found Hughes agitated and calmed him down before taking him in for a 72-hour detention. Hughes was not charged in connection with any of these incidents.

Dr. Charles Schaffer, a forensic psychiatrist, reviewed Hughes' medical records and police reports. Hughes had a chronic diagnosis of schizoaffective disorder, which combines a mood bipolar disorder and a thought disorder. Symptoms include delusions, hallucinations, bizarre thoughts, and severe thought disorganization. The records also revealed Hughes suffered from PTSD, which has symptoms including nightmares, flashbacks, and anxiety triggered by his surroundings. Both conditions can impact an individual's ability to recall events.

Dr. Schaffer's review of the medical records revealed Hughes had not taken his medications while an out-patient. Hughes appeared to be under the influence when he was hospitalized. Dr. Schaffer also testified methamphetamine use increases the aggressive and violent tendencies associated with schizoaffective disorder.

Dr. Elmer Gurmai, a psychiatrist at Sierra Vista Hospital, testified Hughes was admitted to the facility twice in February 2015. Hughes told Dr. Gurmai he heard voices and thought he would become violent if he felt threatened. Hughes returned to the hospital in April 2015 and was released April 20. Upon his release, Hughes was prescribed Ivega and Prozac.

*Verdict and Sentencing*

The jury found defendants not guilty on count I, attempted premeditated murder. The jury found defendants guilty on the nine remaining counts. The jury also found true the deadly weapon allegations on counts II and VIII and the infliction of great bodily injury allegation on count V. Defendants admitted the prior conviction allegations, and Rhodes admitted the prior prison term allegations.

9

The trial court denied Brunson's *Romero* motion to dismiss his prior strike conviction.[2]  The court sentenced Brunson to a determinate term of 34 years and eight months:  16 years on count III, kidnapping (eight years doubled for the strike); a consecutive term of two years eight months on count IV, robbery (one-third the midterm of four years, doubled for the strike); a consecutive term of three years on count V, assault with a deadly weapon (one-third the midterm of three years, doubled for the strike, plus one year for the great bodily injury allegation); a consecutive term of six years on count VI, dissuading a witness (the midterm of three years, doubled for the strike); 16 months on count VII, criminal threats (one-third the midterm of two years, doubled for the strike), stayed under section 654; 16 months on count VIII, false imprisonment (one-third the midterm of two years, doubled for the strike), plus four months for the deadly weapon enhancement (one-third of one year), all stayed under section 654; a consecutive term of two years on count IX, sale of methamphetamine (one-third the midterm of three years, doubled for the strike); and 16 months on count X, possession for sale of methamphetamine (one-third the midterm of two years, doubled for the strike), stayed under section 654.  The court imposed an additional five years for the prior serious felony conviction.  (§ 667, subd. (a).)[3]

The court also sentenced Brunson to an indeterminate term of 20 years to life on count II, torture (seven years to life, doubled for the strike), though, more appropriately,

---

[2]     *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.

[3]     We note that " 'The one-third-the-midterm rule of section 1170.1, subdivision (a), only applies to a consecutive sentence, not to a sentence stayed under section 654.' (*People v. Cantrell* (2009) 175 Cal.App.4th 1161, 1164.)  To effectuate section 654, the trial court must impose a full term and stay execution of that term.  (*People v. Alford* (2010) 180 Cal.App.4th 1463, 1469-1472.)" (*People v. Relkin* (2016) 6 Cal.App.5th 1188, 1197-1198.)  We will order the trial court on remand to modify the judgment accordingly.

the sentence should have been expressed as 14 years to life plus one year for the deadly weapon allegation and five years for the prior felony conviction.

The trial court denied Rhodes' *Romero* motion and sentenced him to a determinate term of 40 years eight months based on the same sentences as Brunson on counts III through X, plus one year for each of three prior prison terms and another three years for a prior drug conviction. (§ 667.5, subd. (b); Health & Saf. Code, § 11370.2, subd. (c).) Like Brunson, Rhodes was sentenced to an indeterminate term of 20 years to life on count II, torture.

Defendants filed timely notices of appeal.

## DISCUSSION

### I

### *Exclusion of Evidence*

Defendants argue the trial court infringed upon their constitutional right to present a full defense by unreasonably restricting the evidence. They fault the trial court for curtailing the testimony of both Dr. Gurmai and Deputy Milton, who testified regarding Hughes' mental issues and propensity for violence.

*Background*

Prior to trial, Brunson's counsel subpoenaed Hughes' psychiatric medical records from Sierra Vista Hospital. The trial court ordered the records sealed pending further action. At the conclusion of Hughes' direct examination, counsel for both defendants moved to view the records.

The trial court reviewed the records in camera and found some relevant to Hughes' credibility. The court ordered them turned over to defense counsel and the prosecution. The court granted defense counsels' motion to continue the trial for two months to allow counsel to further prepare their defense in light of the records.

11

When trial resumed, defendants' counsel incorporated the records into their cross-examination of Hughes. Hughes testified he experienced hallucinations and thoughts of suicide and acknowledged multiple involuntary hospitalizations. He also testified he becomes hostile and aggressive if he fails to take his prescribed medications. In addition, Hughes admitted his altercations with the police stemming from arguments with his father, including an incident in which they pulled knives on each other.

Defense counsel elicited testimony from Deputy Milton regarding Hughes' three involuntary hospitalizations stemming from his violent behavior. Dr. Schaffer explained Hughes' diagnoses of schizoaffective disorder and PTSD and their side effects. Dr. Schaffer testified Hughes failed to take his medication and had been violent with his father. Dr. Gurmai testified Hughes admitted hearing voices and thinking he would become violent when threatened.

Outside the jury's presence, the trial court stated it allowed Deputy Milton to testify about Hughes' aggressive behavior under Evidence Code section 1103, subdivision (a)(1). The trial court believed the audio recording recovered from the scene raised "a specter of self-defense." Rhodes' counsel argued that the defense "should have been given wider rein to further explore Mr. Hughes' antisocial conduct, even if it may have been cumulative, based on the fact that our clients are looking at very serious consequences if convicted."

Prior to Dr. Gurmai's testimony, Rhodes' counsel sought to introduce evidence that, on July 10, 2015, months after the incident, in an emergency room Hughes stated "that he was hearing voices telling him to hurt himself and others, and he stated that the voices were sometimes present and sometimes not, and then more recently they were louder." Hughes had also told Dr. Gurmai that he was "thinking about making the police kill him, totally unrelated to the April incident."

Rhodes' counsel argued: "Mr. Hughes apparently told somebody -- I'm thinking it's Dr. Gurmai -- that . . . Mr. Hughes was thinking about making the police kill him,

12

totally unrelated to the April incident. But I would offer it as -- I think he said basically he's not necessarily a violent person. I'm not sure if I asked him." The trial court disagreed: "I don't believe that's relevant information. [¶] . . . [¶] . . . There's been adequate testimony that he's suicidal. There was also testimony from the officer this morning [Milton] that he was saying he wanted them to come in and shoot him." Rhodes' counsel also sought to establish that Hughes returned to Sierra Vista about two months after the incident. The trial court responded: "I don't think that's relevant. [¶]. . . [¶] . . . Not at all."

Prior to his trial testimony, Dr. Gurmai stated that Hughes had been admitted to Sierra Vista Hospital six times, twice in February 2015. He reviewed a report he had written in July 2015 in which he stated that in February 2015 Hughes told him that "[h]e was thinking about making the police kill me." However, Dr. Gurmai could not recall Hughes having made the statement.

The court declined to allow Hughes' statement to be introduced.

*Discussion*

Defendants contend the issue of Hughes' mental health and propensity for violence formed a significant part of their defense, which challenged Hughes' ability to perceive reality. The court's limitations on the testimony by Dr. Gurmai and Deputy Milton denied defendants' constitutional right to present a full defense.

A trial court's exclusion of evidence vital to a defendant's defense constitutes a denial of a fair trial in violation of due process. However, a defendant does not have a constitutional right to present all relevant evidence in his favor. (*People v. Babbitt* (1988) 45 Cal.3d 660, 684.) The trial court possesses the discretion to admit or exclude evidence offered for impeachment. If the excluded evidence would not have significantly altered the impression of the witness's credibility, constitutional guarantees do not limit this

13

discretion. (*People v. Contreras* (2013) 58 Cal.4th 123, 152; *People v. Rodriguez* (1999) 20 Cal.4th 1, 9.)

Under Evidence Code section 352, the court may exclude evidence if its probative value is substantially outweighed by the probability that its admission will necessitate undue consumption of time or create a danger of undue prejudice by confusing or misleading the jury. We review a trial court's Evidence Code section 352 determination under the deferential abuse of discretion standard. (*People v. Avila* (2014) 59 Cal.4th 496, 515.) We will not reverse unless the trial court exercised its discretion in an arbitrary, capricious, or absurd manner resulting in a miscarriage of justice. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1004.)

Defendants contend the excluded evidence was not cumulative but "directly impeached Hughes's credibility in a manner that could not otherwise be shown through other evidence. Hughes's credibility was central to the entire prosecution case and thus a major point of attack for the defense, specifically related to Hughes's ability to perceive reality and his potential for aggressiveness."

We disagree. Defendants argue the court improperly excluded evidence that Hughes continued to suffer from mental health problems, which would have clarified some of the conflicting statements he made during trial regarding his violent outbursts and behavior when he failed to take his medication. However, Dr. Schaffer testified Hughes was diagnosed with chronic schizoaffective disorder. He also described those suffering from the disorder as experiencing hallucinations and memory problems. The proposed evidence was cumulative of Dr. Schaffer's testimony.

Defendants also fault the trial court for limiting Deputy Milton's testimony about Hughes' prior incidents of psychosis-related violence. However, defendants admit the record does not set forth the "precise nature of the additional evidence that was excluded," since counsel did not specify the additional evidence to be presented. Even without this specificity as to the evidence excluded, we find no error. Deputy Milton

14

testified as to Hughes' aggressive behavior on three occasions, including his angry, irrational, and hostile conduct at the liquor store, Hughes' threatening to kill his father and yelling that he wanted the police to shoot him, and another incident at the house which ended in a 72-hour detention. Deputy Milton's testimony detailed these incidents, none of which led to criminal charges.

The trial court's exclusion of evidence it found cumulative was not an abuse of discretion and did not deprive defendants of their right to present a defense.

II

*Convictions for Kidnapping and Dissuading a Witness*

Defendants argue the trial court violated section 654 in imposing separate punishments on count III for kidnapping and count VI for dissuading a witness, arguing defendants committed both offenses with the same objective to cover up their crimes against Hughes.

Section 654 provides in relevant part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

Whether a course of criminal conduct is divisible and gives rise to more than one act under section 654 depends on the intent and objective of the defendant. If the offenses were pursuant to one objective, the defendant may only be punished for one offense. However, if the defendant had multiple objectives, independent of and not just incidental to each other, the court may sentence the defendant for each violation, even though the violations share common acts or were part of an otherwise indivisible course of conduct. (*People v. Rodriguez* (2009) 47 Cal.4th 501, 507; *People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.)

15

Whether a single course of conduct is divisible into different offenses based on separate objectives is a question of fact for the trial court. We uphold the trial court's findings on appeal if supported by substantial evidence. We review the trial court's determination in the light most favorable to the judgment and presume the existence of every fact the trial could reasonably deduce from the evidence. (*People v. Vang* (2010) 184 Cal.App.4th 912, 915-916; *People v. Jones, supra*, 103 Cal.App.4th at p. 1143.)

Our review of the evidence supports the trial court's sentencing defendants on both charges. Hughes testified defendants beat and stabbed him until he was unable to walk. Brunson said he did not want Hughes to die in his house. Defendants dragged Hughes outside, wrapped him in a blanket, and put him in Brunson's truck. Brunson said he knew a place where they could dump Hughes and he wouldn't be found for several days. However, as the defendants drove, Brunson had second thoughts, concerned the woman present that night might tie them to Hughes' death. Defendants decided to drop Hughes at a hospital and claim he had tried to rob them. When defendants and Hughes arrived at the hospital, Brunson told Hughes he was lucky and had better keep his mouth shut, a threat he subsequently repeated. Hughes told a nurse he thought defendants were going to kill him.

Based on the evidence at trial, the trial court could conclude defendants beat Hughes, put him in the car, and drove off to kill him. Defendants kidnapped Hughes intending to drive him to an isolated area and kill him. Subsequently, defendants rethought their plan and instead dropped him at the hospital. In the process, Brunson threatened Hughes to keep him from revealing what happened. Although the events happened in a sequence, defendants harbored two distinct criminal objectives in committing the kidnapping and the dissuasion of Hughes. (*People v. Tom* (2018) 22 Cal.App.5th 250, 261.)

We find *People v. Nichols* (1994) 29 Cal.App.4th 1651, instructive. The defendant in *Nichols* was convicted of kidnapping in the process of a robbery and

16

attempting to dissuade a witness. The defendant and accomplices kidnapped a truck driver and made off with his truck loaded with cargo. During the ordeal, the defendant threatened the driver with death if he told anyone. (*Id.* at p. 1654.) On appeal, the court found substantial evidence of two discrete objectives. The first was kidnapping with the intent to hijack the truck and make off with its contents. The second was to avoid detection and retribution by intimidating the driver. (*Id.* at p. 1657.)

In the present case, defendants kidnapped Hughes to get him out of the house and dispose of him. Brunson then threatened and intimidated Hughes to escape punishment for their actions. Defendants argue *Nichols* is distinguishable because the defendant in that case committed a crime with an intrinsic benefit separate from the cover-up. "Here, by contrast, there was no value in the kidnapping beyond the same cover up that the dissuasion also furthered." However, "value" is not the test. The objective of the kidnapping was to dispose of Hughes; the objective of dissuasion was to avoid punishment. We find no error.

### III

*Sentences for Assault with a Deadly Weapon and Torture*

Defendants also contend their sentences on count V for assault with a deadly weapon and count II for torture violated section 654. Defendants argue the prosecution did not distinguish the injuries inflicted with the knife from other injuries associated with the torture count. The People agree.

*Background*

The prosecutor described the conduct underlying the torture count: severe beating and stabbing of Hughes by Brunson and Rhodes, and the use of the dog collar and shock device. The prosecutor stated: "There seems to be no other explanation for doing these types of things other than just having a sadistic purpose."

17

The prosecutor described the assault with a deadly weapon charge: "The defendant did an act with a deadly weapon other than a firearm -- in this case, a knife -- each of them -- they acted willfully, and when the defendant acted, he was aware of the facts that would lead a reasonable person to realize the act, by its nature, would directly and probably result in application of force. So in other words, it's reasonable that a person would have the knife, stab someone in the body, it's going to cause force to someone." The deadly weapon enhancement, which was alleged as to torture, was based on the use of the knives.

*Discussion*

Both defendants and the People cite *People v. Mejia* (2017) 9 Cal.App.5th 1036. In *Mejia*, the appellate court determined a defendant could not be punished separately for torture and spousal abuse when the acts underlying the spousal abuse were intertwined with the torture charge. (*Id.* at pp. 1043-1046.) Torture requires the infliction of great bodily injury with intent to cause cruel or extreme pain and suffering. (*Id.* at p. 1044; § 206.) The court concluded: "Accordingly, although a defendant may be convicted of both torture and any or all of the underlying acts [citation], section 654 precludes imposition of unstayed sentences for both torture and any of the underlying assaultive offenses upon which the prosecution relies to prove the element." (*Mejia*, at pp. 1044-1045.) Therefore, the imposition of the unstayed sentences on those counts violated section 654, "because all of the acts of spousal and infliction of corporal injury on a spouse were included among the acts underlying the torture count and were essential to satisfying an element of that offense." (*Mejia*, at p. 1046.) In contrast, the court found section 654 did not preclude separate punishment for torture and criminal threat, because torture requires infliction of pain and suffering, while criminal threats are based on emotionally terrorizing a victim. (*Mejia*, at p. 1047.)

18

The parties agree the assault with a deadly weapon charge was based on defendants' stabbing Hughes with knives, as the prosecutor argued at trial. The prosecutor also referenced the stabbing of Hughes as the central event supporting the torture charge. As the People acknowledge, "[a]s in *Mejia*, the prosecutor relied on the underlying assaultive offenses to help establish the torture offense, and she did not distinguish among the various injuries in support of the torture charge. The only unanimity instruction the jury received was in connection with the false imprisonment charge (count 8). Nor did the evidence suggest any objective for the knife assaults other than 'to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose.' . . . Thus, the People are forced to concede that [defendants] cannot be punished separately for their convictions on torture and assault with a deadly weapon."

Defendants were sentenced to 14 years to life for torture on count II and three years for assault with a deadly weapon on count V. Under section 654, at the time of sentencing, the longest of the two sentences had to be imposed, the sentence for assault had to be stayed. Under section 654, as amended by Assembly Bill No. 518 (2021-2022 Reg. Sess.), enacted after sentencing (see discussion, *post*, at pp. 24-25) the trial court has the discretion to impose punishment for either torture or assault with a deadly weapon. We will therefore remand for the court to exercise its discretion and modify the sentence accordingly. As noted earlier, the one-third-the-midterm rule of section 1170.1, subdivision (a), only applies to a consecutive sentence, not a sentence stayed under section 654 and thus a full-term sentence must be imposed and stayed. (See *People v. Cantrell, supra*, 175 Cal.App.4th at p. 1164.)

IV

*Corrections to Abstract of Judgment*

Each defendant was sentenced to seven years to life in prison for torture (count II), doubled to fourteen years to life based on a prior strike. Sentencing enhancements of one year (deadly weapon) and five years (prior serious felony) were added for each. Defendants contend the abstract of judgment is confusing; the term on count II reflected in box No. 6c differs from the term indicated by checking box No. 5 and, in any event, incorrectly includes the six years of enhancements. The parties agree that box No. 6 should reflect the base term, doubled for the strike prior, excluding enhancements. We agree and the court should be guided by this principle on remand.

V

*Prior Drug Conviction Enhancement*

Rhodes argues that the consecutive three-year term in conjunction with count IX under Health and Safety Code section 11370.2 must be stricken because the trial court never made a finding on the allegation before imposing the enhancement. The People agree the enhancement should be stricken, but on different grounds and the case must be remanded because the trial court failed to impose a sentence on one of the four prior prison term allegations.

*Background*

The information alleged Rhodes had a prior strike conviction and a serious prior felony conviction, both based on a 1991 conviction for assault with a deadly weapon. (§§ 667, subds. (b)-(j), 1170.12, 667, subd. (a)(1).) The information also alleged Rhodes served prison terms for four felony convictions (§ 667.5, subd. (b)): (1) in 2002 for assault with a deadly weapon; (2) in 1996 for violation of Health and Safety Code section 11377, subdivision (a); (3) in 1993 for violation of Health and Safety Code section 11379, subdivision (a); and (4) in 1991 for assault with a deadly weapon. The 1993 drug

20

conviction was also alleged as a separate sentencing enhancement under Health and Safety Code section 11370.2, subdivision (c), with respect to counts IX and X.

Rhodes admitted the strike conviction, the previous serious felony conviction, and the four prior prison term allegations. The trial court accepted the admissions.

The court doubled Rhodes' terms on each count for the strike prior and imposed an additional five years on both Rhodes' determinate and indeterminate terms for the prior serious felony conviction; imposed three 1-year terms for the prior prison term enhancements; and an additional three-year term for the prior drug conviction. As to the latter, the court stated: "The Court also found true the prior drug conviction and pursuant to Health and Safety Code Section 11370.2[, subdivision] (c) the Court is going to sentence you to the consecutive term of three years."

*Discussion*

Rhodes argues that although he admitted his 1993 drug conviction that served as the basis for the three-year enhancement, the trial court never expressly found the allegation true before imposing the enhancement and therefore the enhancement was unauthorized. Rhodes states: "The record unequivocally shows the trial court did not enter a true finding on that enhancement, nor did [Rhodes] admit the truth of that enhancement, only the fact of the prior conviction."

In support, Rhodes cites *In re Candelario* (1970) 3 Cal.3d 702, 706 (*Candelario*). In *Candelario*, the defendant entered a plea of not guilty to sale of heroin, but admitted the prior felony conviction of possession of marijuana. The record of the sentencing hearing and the abstract of judgment stated only that the defendant was convicted of the substantive offense, but neither contained a finding on the prior conviction. Subsequently, the trial court filed an amended abstract of judgment to which the prior conviction was added. (*Id.* at pp. 704-706.)

21

The Supreme Court concluded the addition was improper: "It is clear that since petitioner admitted the prior conviction, the trier of fact need not have made an independent determination of its validity. [Citations.] Admission of the prior offense, however, does not thereby relieve the court of its responsibility to pronounce judgment finding petitioner guilty of the substantive offense with a prior conviction, and to have such judgment entered into the official records of the court. [¶] Reference to the prior conviction must be included in the pronouncement of judgment for if the record is silent in that regard, the absence of evidence to the contrary, it may be inferred that the omission was an act of leniency by the trial court. In such circumstances the silence operates as a finding that the prior conviction was not true." (*Candelario, supra*, 3 Cal.3d at p. 706.)

The People argue the trial court sentenced Rhodes to the three-year enhancement after finding true the prior drug conviction for the purposes of Health and Safety Code section 11370.2. Because the court explicitly referred to the prior conviction, its failure to make an express finding cannot be interpreted as leniency. We agree. "In pronouncing judgment, the trial judge must make it clear the defendant is sentenced as one whose prior conviction has been admitted or found true." (*People v. Mesa* (1975) 14 Cal.3d 466, 472.)

The People contend the enhancement must be stricken on another basis. Effective January 1, 2018, Health and Safety Code section 11370.2 was amended to provide a three-year enhancement only if a defendant has a prior conviction under Health and Safety Code section 11380. (Health & Saf. Code, § 11370.2, subds. (a)-(c); Stats. 2017, ch. 677, § 1.) We agree. Under *In re Estrada* (1965) 63 Cal.2d 740, the amended applies retroactively. Therefore, the three-year enhancement based on Rhodes' 1993 conviction for violating Health and Safety code section 11379 must be stricken.

# VI

## *Prior Prison Term Allegations*

For purposes of section 667.5, subdivision (b), Rhodes admitted to four prior prison terms he served for assault (§ 245, subd. (a)(1)), drug possession (§ 11377, subd. (a)), drug sale and transportation (§ 11379, subd. (a)), and assault (§ 245, subd. (a)(1)). At sentencing the court imposed only three 1-year terms, not four. The People note the record does not explain the discrepancy. The probation report recommended three consecutive one-year terms for the section 667.5, subdivision (b) enhancement, but notes that all four prior prison term allegations were found true. Because the trial court did not impose or strike one of the four prison term enhancements, the People contend the case should be remanded for further proceedings in that regard. (*People v. Bradley* (1998) 64 Cal.App.4th 386, 392-395.)

However, the sentencing landscape has changed in the interim. Section 667.5, subdivision (b), formerly provided in relevant part that "where the new offense is any felony for which a prison sentence or a sentence of imprisonment in a county jail . . . is imposed or is not suspended, in addition and consecutive to any other sentence therefor, the court shall impose a one-year term for each prior separate prison term . . . for any felony . . . ." Senate Bill No. 136 (2019-2020 Reg. Sess.), signed by the Governor on October 8, 2019, amended this provision to substitute "a sexually violent offense as defined in subdivision (b) of Section 6600 of the Welfare and Institutions Code" in place of "any felony." This amendment was effective January 1, 2020. (Stats. 2019, ch. 590, § 1.) None of Rhodes' prior prison terms was served for an offense listed in the definition of a "sexually violent offense" in Welfare and Institutions Code section 6600, subdivision (b).

We assume, absent a clear indication to the contrary, that the Legislature intended an "amended statute to apply to all defendants whose judgments are not yet final on the statute's operative date." (*People v. Brown* (2012) 54 Cal.4th 314, 323; *In re Estrada,*

23

*supra*, 63 Cal.2d at pp. 742-748; *People v. Lopez* (2019) 42 Cal.App.5th 337, 341-342.) Rhodes' judgment is not final on appeal and therefore he benefits from Senate Bill No. 136. (*Lopez*, at p. 342.) The trial court's sentences imposed under former section 667.5 must be stricken.

## VII

### *Supplemental Briefing*

The sentencing laws applicable to defendants' cases changed considerably as a result of legislation enacted following their convictions. The changes were addressed in two rounds of supplemental briefing.

In January 2017, the trial court imposed on defendants a then-mandatory consecutive term of five years for the prior serious felony convictions under section 667, subdivision (a), to the determinate term and a separate five-year term to the indeterminate term. Section 667, subdivision (a)(1), provides for a five-year enhancement for a prior serious felony conviction. Under prior law, the trial court had no discretion to strike an enhancement proposed under the statute. Former section 1385, subdivision (b) stated: "This section does not authorize a judge to strike any prior conviction of a serious felony for purposes of enhancement of a sentence under Section 667." In September 2018, the law changed, ending the limitation on sentencing discretion by removing subdivision (b), effective January 1, 2019. (See Stats. 2018, ch. 1013, §§ 1, 2.)

In a first round of supplemental briefing, defendants requested remand for the trial court to exercise its discretion to dismiss one or both of the five-year enhancements under amended section 667, subdivision (a).

The second round of supplemental briefing concerns changes to section 654. Under the language of section 654 in effect at the time of defendants' sentencing, an act or omission punishable in different ways by different laws had to be punished under the law providing for the longest possible term of imprisonment. Assembly Bill No. 518

24

(2021-2022 Reg. Sess.), passed after the sentencing, removed the mandate and gave trial courts the discretion to impose punishment under any provision, a change that could potentially result in lesser punishment. (See Stats. 2021, ch. 441, § 1.) Defendants argue remand is also required as to permit the court to exercise its discretion under section 654 as amended.

The People acknowledge these amendments apply retroactively to defendants' cases, but argue no remand is necessary because the record reveals the trial court would not have exercised the discretion conferred by either amendment.

Remand for resentencing is not required if the record shows a trial court clearly indicated at the original sentencing it would not have stricken the enhancement even if it possessed the discretion. "The trial court need not have specifically stated at sentencing it would not strike the enhancement if it had the discretion to do so. Rather we review the trial court's statements and sentencing decisions to infer what its intent would have been." (*People v. Jones* (2019) 32 Cal.App.5th 267, 273.)

There is reason to suspect the trial court would not exercise the discretion granted by the statutory changes. The trial court denied both defendants' *Romero* motions, which would have reduced their kidnapping convictions from 16 years to eight years. The court imposed the upper term on the kidnapping count and ran all sentences consecutively. The court commented critically on Brunson's expression of remorse, called his actions sadistic, and likewise called the actions of Rhodes in slashing a vulnerable and defenseless victim vicious and sadistic, recounted defendants' criminal histories, and gave them aggravated terms.

However, the Legislature's actions during the course of this appeal greatly changed the sentencing rules in this case. Nothing in the trial court's imposition of the sentence demonstrates what it would do with the newly afforded discretion under Assembly Bill No. 518 and Senate Bill No. 1393 (2017-2018 Reg. Sess.). We conclude the trial court must be afforded the opportunity to exercise this sentencing discretion.

25

(See *People v. McDaniels* (2018) 22 Cal.App.5th 420, 425; *People v. Garcia* (2018) 28 Cal.App.5th 961, 973-974.)

DISPOSITION

The judgments are modified as follows:

(1)    The three-year enhancement to Rhodes' sentence based on his 1993 conviction for violating Health and Safety Code section 11379; and the one-year enhancements imposed on Rhodes for prior prison terms under section 667.5, subdivision (b) are stricken.

(2)    The case is remanded for the trial court to consider whether to strike defendants' prior serious felony convictions for purposes of enhancement under section 667, and to exercise its discretion in deciding which terms to stay pursuant to section 654 (as amended by Stats. 2021, ch. 441, § 1).  In resentencing under section 654, the trial court must impose a full term and stay execution of that term.  The one-third-the-midterm rule of section 1170.1, subdivision (a) does not apply.  (See *People v. Cantrell, supra*, 175 Cal.App.4th at p. 1164.)

(3)    The trial court is directed to prepare amended abstracts of judgment to reflect the modifications, and send a copy of the amended abstracts to the Department of Corrections and Rehabilitation

The judgments are otherwise affirmed.


/s/
RAYE, P. J.

We concur:

/s/
HULL, J.

/s/
DUARTE, J.