Filed 12/2/24  P. v. Lemons CA3
Opinion following transfer from Supreme Court

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C082451 |
| Plaintiff and Respondent, | (Super. Ct. No. 15F00649) |
| v. | OPINION ON TRANSFER |
| GLEN DALE LEMONS, | |
| Defendant and Appellant. | |

A jury found defendant Glen Dale Lemons guilty of sexually molesting two sets of underage sisters.  Sentenced to a determinate term of 50 years and an indeterminate term of 135 years to life, defendant appeals, contending the trial court erred in excluding opinion testimony, prohibiting defendant from cross-examining a witness, improperly admitting evidence of uncharged sex acts, and committed sentencing error.

After we filed our original opinion in this matter affirming the judgment, the California Supreme Court granted defendant's petition for review and transferred the matter to us to reconsider our opinion in light of recent authority on the notice required to

1

sentence a defendant under the One Strike law. We vacated our opinion, and we also granted defendant leave to raise additional allegations of sentencing error.

Except to remand the matter for resentencing, we affirm the judgment.

## FACTS AND HISTORY OF THE PROCEEDINGS

An amended information charged defendant with committing a lewd and lascivious act upon M., a child under the age of 14 (counts one & two) (Pen. Code, § 288, subd. (a); statutory section citations that follow are found in the Penal Code unless otherwise stated); committing a lewd and lascivious act upon S., a child under the age of 14 (count three) (§ 288, subd. (a)); committing a forcible lewd and lascivious act upon A., a child under the age of 14 (counts four & five) (§ 288, subd. (b)(1)); committing a forcible lewd and lascivious act upon B., a child under the age of 14 (counts six, eight & nine) (§ 288, subd. (a)); and committing a forcible lewd and lascivious act upon B., a child under the age of 14 (count seven) (§ 288, subd. (b)(1)).

The information also alleged defendant committed sexual offenses against multiple victims and had sustained five prior prison terms. (§§ 667.61, subd. (e)(4), 667.5, subd. (b).) The court granted defendant's request to bifurcate the prior conviction allegations.

A jury trial followed. The following evidence was introduced at trial.

<u>M.</u> and <u>S.</u>

In 2014, M. and S. resided in Sacramento with their parents. Their mother had a daughter from a previous relationship with defendant. Their father met defendant a few years previously and the two became friends. Defendant worked on their father's computer and car and visited every couple of weeks with his friend Jenna. The pair would spend the night with the family. M. and S.'s father never saw anything wrong occur between defendant and his daughters.

2

M.

M., age eight at the time of the trial, testified defendant often visited. He and his girlfriend Jenna were friends with her parents. When defendant visited he touched her four to six times.

M. had not seen defendant in a year and could not identify him at trial. One of her strongest recollections was, at age six, when she was in first grade. Defendant sat next to her on the couch. He pulled her pants and panties down and touched the place between her legs that she referred to as her "tutu" with his fingers. M. was frightened; defendant did not say anything when he touched her. She pulled her pants up and went to her mother's bedroom. A few months later, M. told her mother about defendant's actions.

On another occasion, M. played in the garage with S. M. was in first grade and six or seven years old. Defendant touched M. on her "tutu" over her clothing. S. was playing nearby. M. told her mother about the incident about a week after she told her about the previous incident. She also told defendant's daughter. S. told M. defendant also touched her.

S.

S., six years old at trial, testified that when she was four or five years old defendant touched her. Defendant and Jenna came to the house. S. sat on defendant's lap while they watched television. He touched her "tutu" with his finger on the outside of her panties. S. called her vagina "tutu." Defendant did not say anything or move his finger, but S. said it tickled. After S. got off defendant's lap, she told her mother what happened.

M. and S.'s Father

M. and S.'s father testified that once when defendant visited, he was playing on his computer while defendant and S. watched television on the couch. He heard S. say "my mama told me that whenever someone touches me on my tutu that I should tell her

3

right away." At the time, he forgot to ask S. what happened, but later told his wife about the incident. As the two talked to S., M. said she had the same problem with defendant. M. said defendant touched her a couple of times: once in the backyard and once in a truck. The conversation took place a few days before Thanksgiving. They notified authorities on December 2, 2014, after Thanksgiving.

About a month later, defendant came to the house and M. and S.'s father told him he could not talk to him. He did not see defendant again until trial. He liked defendant and missed him. He also stated that, as kids, M. and S. were not always honest.

### Police Investigation

On December 2, 2014, Deputy Sam Bates interviewed M. She told him a family friend touched her between the legs on her "tutu" in the living room. The friend told her not to tell anyone, "It was a family secret."

During another incident, defendant touched her inside and outside her pants in the garage. She told defendant's daughter about what happened but did not remember what she said. She did not discuss the touching in the backyard or in a truck.

Deputy Rodolfo Roque interviewed S. She stated that while sitting on defendant's lap, he touched her groin. She called it her "tutu" and pointed to her vagina.

M. and S.'s father told an officer that he did not say anything about S.'s comments regarding defendant for several weeks. On November 25, 2014, while watching television with his wife, he discussed S.'s comments about defendant. M. said, "Glen did that to me too a couple of times and told me it's a secret."

### SAFE Interviews

In a January 2015 interview with a sexual assault forensic examiner (SAFE), M. said defendant pulled her pants and panties down while they sat on the couch. He touched her "tutu" with his hand when she was six years old. M. was scared. Although defendant told her it was a secret, she told on him. M. also said defendant touched "at

4

her pants" in the garage when S. was there.  S., in her SAFE interview, said defendant touched her "tutu" on top of her clothing while they sat on the couch.  The jury heard tapes of both interviews.

Defendant's Conversation with M. and S.'s Mother

In May 2015, defendant spoke to M. and S.'s mother by phone from jail.  She said, "I forgive you."  Defendant responded, "I'm sorry."  Later defendant said, "They can't do something if there is nothing that has happened."  The jury heard the tape of the phone call.

A. and B.

A. and B.'s mother and defendant married in 2000 and separated in 2002.  They were still legally married at the time of trial.  The couple lived in a studio apartment in Roseville, an apartment above a garage in Roseville, and a townhouse in Yuba City.  She had three daughters from previous relationships: Mi., A., and B.  The girls stayed with their mother and defendant on summer breaks and holidays.  When her daughters told her about defendant's molestations, she did not contact authorities.

A.

At trial, A. was 27 years old.  When she was 10 or 11, she visited defendant and her mother at their studio apartment with her sister B.  Mi. was also often there.  A. and B. slept on a pullout bed with sheets separating them from defendant and their mother in their bed.

Once, during a visit, A. woke up with a bloody nose.  She looked for something to stop the bleeding and defendant approached her, naked with a toilet paper roll.  She took the toilet paper and blew her nose.  Defendant grabbed her left hand, brought it towards his penis and told her it was okay to touch his penis.  After she jerked her hand away,

5

defendant grabbed it and placed it on his penis. He moved her hand up and down in a "cupping motion."

A. was sitting on the pullout bed, with B. asleep next to her. After A. began to cry, defendant became frustrated and released her hand. She tried to go back to sleep. The following day she kept her distance from defendant. She did not tell anyone what happened.

She finally told her mother that defendant made her touch him after her sister reported defendant's acts against her a couple of years later. Her mother did not contact the police. A. talked to her sisters prior to talking to the police. Both said defendant had molested them.

B.

B., 22 years old at the time of trial, testified she met defendant when she was in elementary school after he married her mother. B. stayed with the couple during summer vacation and school breaks.

One day, while her mother was at work, B. was lying on her mother's bed in the Roseville apartment. She was five or six years old. Defendant entered wearing pulled down shorts, exposing and touching his penis. Defendant got on the bed with B. and continued touching himself. She pretended to sleep. Defendant touched her vagina under her nightgown and underwear but did not penetrate her with his finger. He touched his penis with the other hand and asked her if she liked it. Defendant made B. touch his penis, grabbing her hand and moving it up and down. She could not recall if his penis was erect. When defendant stopped touching her, she got out of bed and went into the bathroom until her mother returned from work. She did not say anything because she did not know any better.

On another occasion, in the Yuba City townhouse, B. sat on the living room couch. Her mother was in the kitchen and defendant stood on the staircase masturbating.

6

When B. met his eye, defendant continued, but stopped and went upstairs when her mother came out of the kitchen. When her mother went back into the kitchen, defendant came back downstairs and continued to masturbate. B. hid behind a recliner.

In another incident in Yuba City, B. was asleep in the upstairs bedroom she shared with A. She slept in the top bunk, A. in the lower bunk. B. wore a nightgown and underwear. Defendant came into the bedroom, got on the bunk bed ladder, and rubbed her vagina under her nightgown, but on top of her underwear.

Later, again in Yuba City, defendant put his hand under B.'s underwear and his fingers in her vagina while she slept in a bunk bed. She rolled over in an effort to stop him. The penetration lasted less than a minute but hurt her. She did not say anything. When A. "rustled around," defendant left. He told B. not to tell anyone or he would hurt her family. Afraid, she told no one.

Around the age of eight or nine, B. wrote her mother a note, telling her that defendant touched her. She wrote that she did not know what to do. When she was 10, her father asked if defendant had ever touched her. Out of fear, she denied the touching. In 2013, she took makeup and clothing from a store, admitted the theft, and returned the items.

B. was aware of defendant's molestation of Mi. and A. However, she never spoke to them about the incidents.

In September 2015, B. gave a statement to a deputy district attorney. She stated defendant married her mother when she was seven. While they lived in one of the apartments, defendant would wait until her mother was at work or out of the room and then make suggestive comments and grab her breasts. During one incident while her mother was at work, defendant came into her mother's bedroom while B. slept. Defendant digitally penetrated her with his finger. She told her mother about it after she learned of defendant's molestation of her sisters.

7

A few days earlier, A. gave a statement to a police officer, telling the officer that she, Mi., and B. had talked about defendant touching them. B. told the same officer defendant inserted his fingers into her vagina during an incident on the bunk bed.

Uncharged Sexual Offenses

Mi.

Mi., B. and A.'s older sister, was 28 at the time of trial. She lived with her mother and defendant in an apartment during seventh and eighth grade when she was 13. She slept on a pullout couch in the same room with defendant and her mother's bed, separated by sheets hung from the ceiling. During summer vacation and school breaks, A. and B. visited.

On the night of December 7, 1999, Mi. sat on a couch in the apartment watching television. Defendant sat nearby and began making "a weird noise" that sounded like "wet skin." She felt awkward and made noises to let defendant know she heard him. When she looked up, she saw defendant's hand moving up and down while touching his private area. She got up walked into the bathroom and shut the door.

Defendant tried to come into the bathroom, explaining he could not help it because she was so pretty. Mi. screamed at him to go away. She left the bathroom and walked to the kitchen where she grabbed something before returning to the bathroom. Agitated, defendant walked around. Her mother, asleep on the bed, did not wake up when Mi. screamed. Her mother had been taking pills at the time, which made her pass out.

When Mi. left the bathroom a few minutes later, defendant was gone. He left his wedding ring on the table and a note. When she was able to wake up her mother, she told her what happened. Her mother took her to live with relatives. Mi. told A. and B. about the incident. A. said defendant made her uncomfortable and B. said defendant had done similar things to her.

The parties stipulated defendant was convicted in May 2003 of a violation of section 314.1, subdivision (1), lewdly exposing himself in a public area where Mi. was present in 2000.

T.

T., 19 at the time of trial, was 10 years old when her father tried to help defendant. Defendant was homeless, and her father gave him work and brought him home.

In October 2007, she came home from school and found defendant in the living room with his computer. She saw a photograph of a man's penis on the screen. Defendant, T., and her father then drove to a football game. T. and defendant were passengers along with her younger sister. As they traveled, defendant held up his phone and showed T. the screen on which he typed: "I want to jack off while you watch me." He also showed her a photo of a man's penis on the phone. He wrote on his phone that she should text him and she knew his number. She told her father after the football game. He called the police and defendant was arrested.

T. admitted that at age 13 she hit her father with a bat during a fight. When she was 17 years old, a party she attended was broken up by police. In the process, she threatened and resisted an officer. Also at 17, she took a bottle of alcohol from a store, a theft she later admitted.

Officers seized defendant's cell phones, laptop, and a "Barely Legal" magazine. One phone contained a photograph of a boy and girl engaged in oral copulation. Another photograph was of a man exposing his penis. Defendant admitted to an officer that he had pictures of minors of a sexual nature and of his penis on his phone.

A forensic examination of the phones and laptop followed. One cell phone contained a series of pornographic images of children in sexually suggestive positions. The other cell phone had photographs of young girls in various stages of undress in sexually suggestive poses. Defendant's laptop contained photos of his penis. The parties

9

stipulated that defendant was convicted of violating section 311.11, subdivision (b), knowingly possessing photographs of minors simulating sexual conduct, in 2007.

Expert Testimony

An expert in child sexual assault accommodation syndrome, Dr. Blake Carmichael, testified that sexually abused children often delay reporting the abuse. Victims may initially deny the abuse but reach out when they are older providing more details of the abuse. Children who have been abused may relay different details to different people, but not always.

Dr. Carmichael also discussed a child's concept of time. A child may remember core facts surrounding the sexual assault, but not specific details. If the abuse occurred frequently over a period of time a victim's memories of the details may be less clear. Not all victims react the same way to abuse. Victims may avoid identifying the perpetrator. Although victims are angry, they may love the perpetrator because they are family members. Children may feel helpless because they cannot make the abuse stop.

Defense

At trial, defendant denied touching the victims. According to defendant, his sexual victimization by family members when he was between the ages of six and 12 precluded him from harming other children. The sexual assaults, including forcible sodomy, caused him irreparable harm. As a result, defendant could not subject a child to such abuse, and he was exceptionally cautious around them.

Defendant had no desire to touch children, but he did desire to expose himself. In 1994, defendant was convicted of exposure involving a child, when he "flashed" three girls, exposing his penis. In 1996, he was also convicted of indecent exposure when he "flashed" his penis to a 17-year-old girl. Defendant believed these exhibitionist tendencies stemmed from being molested when he was a child by a man. The molestations drove him to prove he was a man, a need which resulted in exposing himself

10

to others beginning at age 12. Only therapy helped defendant understand the origins of his need to expose himself.

### Defendant's Testimony Regarding Mi.

Mi.'s mother knew of defendant's past when they married. Mi. moved in with them shortly afterwards. Defendant was reluctant to live with her because it violated his parole, but his wife insisted. She took Mi. out of the apartment during parole checks. Mi. knew about defendant's past. Once, when a parole agent came, Mi. sat behind a sheet.

Mi. slept on the couch while defendant and his wife shared a bed. A sheet separated them for privacy. Once, after his wife took medication before sleeping, defendant became aroused and after he could not wake her up, sat at the foot of the bed and masturbated. Mi. came out of the bathroom. Although defendant hoped Mi. would go back to sleep, she poked her head around the curtain, saw defendant, and said, "oh, my God." Defendant stated he was exposed but not masturbating when Mi. saw him. Defendant's effort to speak to Mi. failed. Defendant wrote a letter to his wife about the incident. He told the police the truth when they questioned him. Defendant pled guilty to indecent exposure in 2002, because he did not want to force Mi. and his wife to testify against one another. The parties stipulated to a police department report in 2001, which stated Mi. walked in on defendant while he was masturbating.

Defendant admitted he had "flashed" Mi. a number of times because of a desire to do so before the masturbation incident. He never masturbated in front of her because she was like a stepdaughter to him.

### Defendant's Testimony Regarding A.

After defendant and his wife married, A. and B. visited. However, neither knew of his criminal history.

11

Defendant admitted exposing himself to A. In the first incident, when she was 11 or 12, he showed her his penis while they sat at the table. They talked about it and she had no reaction. In another incident, defendant woke up and while getting ready for work began masturbating in front of her. Defendant once exposed his penis to her while they rode in a truck; she did not seem to care. According to defendant, A. seemed comfortable with him exposing himself, so he continued to do so. He never touched her. Defendant masturbated in front of her because she made it "available" to him and never told him to stop.

Defendant's Testimony Regarding B.

Defendant never touched or exposed himself to B. She was too young, and he did not have those desires with her. During the incident on the staircase, defendant was exposing himself to his wife, not B. He did not know B. was hiding behind a chair.

Defendant's Testimony Regarding T.

Defendant provided landscaping work for T.'s father and was at the house twice a day, five days a week for five months. T.'s father knew about his past. Defendant brought his computer every day and would look at and send pictures of his penis to his girlfriends.

The day defendant was arrested T. came into the room while he was on the computer. She saw only the computer's back, not the screen. Defendant denied showing her inappropriate photos or messages. Because he had nothing to hide, defendant gave officers his computer and cell phone passwords. He denied telling officers he had pornographic images on his phone or possessed child pornography.

Defendant pled to possessing child pornography on his phone in 2008 because he was facing 70 years in prison. Instead, through the plea, defendant received only four

12

years. Although defendant had pictures of children on his phone, it was not child pornography. He had pictures of adult women on his phone.[1]

Defendant's Testimony Regarding M. and S.

Defendant knew M. and S.'s parents. Their mother was defendant's ex-girlfriend and the mother of his daughter. She knew of defendant's past. They reconnected in 2012 and defendant became friends with M. and S.' father. Defendant and his girlfriend often visited the family's home.

Defendant played with M. and S., and they climbed all over him. However, he never touched them on the couch. They also played in the garage, but defendant denied touching M. Nor did he touch M. in a truck or in the backyard.

Defendant did not expose himself to either girl because he had grown out of being an exhibitionist. Therapy helped defendant overcome the desire to expose himself through confronting the molestations in his past.

In November 2014, defendant contacted Child Protective Services because he was concerned about M. and S.'s mother's treatment of their daughter. She became angry when she found out.

Just before Thanksgiving 2014, S. told defendant whenever someone touched her "tutu," she was supposed to tell her mother. S. was sitting on defendant's lap watching television in the living room. Everyone else was in the bedroom, except for S.'s father who was on the computer. S. continued to sit on his lap watching television. Defendant did not leave until the next day.

A social worker testified that in December 2014 she responded to M. and S.'s residence to investigate sexual abuse allegations. Their father told the social worker he

---

[1] An officer testified he checked defendant's phone and there appeared to be a picture of a minor child, but no messages similar to what T. stated she saw.

contacted law enforcement as soon as he found out about the allegations.  He also stated he immediately spoke to S. after hearing her say she was supposed to tell her mother if someone touched her "tutu."

A few days after the social worker's visit, defendant learned of M.'s and S.'s accusations.  He admitted making the phone call from jail that was played for the jury. He did not expect M. and S.'s mother to be on the phone.  It was one of 400 phone calls he made.  Defendant told their mother he was sorry because he was not supposed to talk with her and did not want to interfere with the investigation.

When defendant spoke to a detective about M.'s and S.'s accusations, the detective told him his DNA would be on the girls.  Defendant was frightened because he knew it was not possible.

### Verdict and Sentencing

The jury found defendant guilty on counts one through three, and five through nine.  The jury found defendant not guilty on count four, but guilty of the lesser included offense of committing a lewd and lascivious act upon A. pursuant to section 288, subdivision (a).  The jury also found true the special allegation that defendant committed a sex offense against two or more victims.  (§ 667.61, subd. (e)(4).)

The court found five alleged prior prison terms to be true.  The court sentenced defendant to consecutive terms of 25 years to life on counts one through three, and consecutive terms of 15 years to life on counts five, seven, eight, and nine.  The court imposed an aggravated term of eight years on count four, and a consecutive term of two years on count six, for a total determinate term of 10 years.  The court also imposed one year for each of the five prior prison term enhancements on each of the seven indeterminate counts, as well as on the determinate term, for a total of 40 years. Defendant's aggregate sentence included a determinate term of 50 years and an indeterminate term of 135 years to life.  Defendant filed a timely notice of appeal.

14

DISCUSSION

I

*Testimony About Victims' Reputation for Honesty*

Defendant argues the trial court erred in excluding his testimony concerning the reputations of Mi., T., B., and A. for honesty. The court's ruling violated defendant's constitutional rights, including his right to due process.

Background

Defense counsel asked defendant whether he had an opinion about Mi.'s "honesty or dishonesty." The prosecution objected, arguing lack of foundation and improper character evidence. The court sustained the objection. Defense counsel asked defendant whether Mi. had lied to him. The prosecution again objected, and the court held an evidentiary hearing.

Outside the jury's presence, defense counsel argued the challenged testimony constituted evidence of truthfulness, motive, and knowledge to challenge the credibility of witnesses under Evidence Code section 1101, subdivision (c).

Defense counsel questioned defendant to lay a foundation for admissibility. Defendant testified he had known Mi. for three years. He heard her tell lies, although he did not remember the exact times. Defendant remembered her manipulating her mother about trying to get some sort of radio with headphones. He testified Mi. made things up to get the radio, but he could not remember what.

Mi. also lied to her mother about taking care of her younger brother. Although she told her mother she was watching him, her father said she left her brother running around the front yard. On cross-examination, defendant conceded it was Mi.'s opinion against her father's opinion as to whether she had neglected her brother. Defendant could not identify any other lies by Mi., but believed she was deceptive.

15

According to defendant, T. played her parents off one another. As she lied to her parents, defendant would sit there and watch. She would look at him and smile. He could not remember any specific lies she told. However, in defendant's opinion, she lied. Defendant recalled a time when she threw a fit when her father told her she could not go to a game.

Defendant was not sure whether A. was dishonest, but she continually faked or exaggerated asthma attacks to get attention. She never had a real asthma attack.

B. also lied. On one occasion, she purposefully stepped on a thumb tack and screamed to her mother that it was an accident. Defendant described B. as very deceptive and dishonest.

The trial court found a lack of foundation for defendant to testify as to the honesty or dishonesty of the four girls.

Discussion

We review a trial court's evidentiary rulings for an abuse of discretion. (*People v. Fuiava* (2012) 53 Cal.4th 622, 663.) However, we review de novo whether the trial court's exclusion of evidence violated a defendant's constitutional rights. (*People v. Seijas* (2005) 36 Cal.4th 291, 304.)

Except as otherwise provided by statute, all relevant evidence is admissible. (Evid. Code, § 351.) The jury may consider in determining a witness's credibility any matter that has a tendency to prove or disprove the truthfulness of the testimony including the witness's character for honesty or veracity or the converse. (Evid. Code, §§ 210, 780, subd. (e); *People v. Taylor* (1986) 180 Cal.App.3d 622, 629.) A defendant must establish a sufficient foundation for the relevance of character testimony and the defendant's personal knowledge of the subject matter. (Evid. Code, § 403, subd. (a)(1), (2).) Character evidence is often based on personal knowledge or observation. (*People v. Lopez* (2005) 129 Cal.App.4th 1508, 1528.)

16

Defendant argues he "personally knew [Mi., T., B., and A.]  He was familiar with them.  He personally observed them deceive and lie.  Mi. actually lied to her mother.  [Defendant] sat and watched [T.] lie.  [A.] deceptively lied to her mother and feigned her hyperventilating asthma attacks.  He saw [B.] purposefully lie.  [Defendant] 'witnessed it.'  The defense established a sufficient foundation by a preponderance of the evidence so as to require admission of his opinion testimony."

We find defendant's claim to have established a foundation for the admissibility of this evidence to be problematic.  Defendant stated he witnessed Mi. lying but could not remember the timing or content of her lies.  Nor could he give any specifics as to her lies about a radio.  Although defendant claimed Mi. lied about taking care of her brother, he also acknowledged it could be considered a difference of opinion.

Similarly, defendant testified T. lied and deceived her parents, but could not recall the specific falsehoods.  Instead, defendant presented his opinion that T. lied.  Defendant agreed that T.'s reaction to not being allowed to go to a football game was about her being spoiled.

Defendant also equivocated concerning A.'s dishonesty.  Although he testified she faked asthma attacks, he described her as an honest person.

Although defendant described B. as a liar, he could only point to the incident with the thumb tack.  He later stated she was too young to lie.

Even assuming the court erred in denying defendant cross-examination on the issue of the victim's veracity, we find any error harmless.  After reviewing the record, we conclude it is not reasonably probable the jury would have reached a more favorable verdict absent the error.  (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

The evidence defendant committed the crimes charged was substantial.  M., S., A. and B. each testified that defendant sexually abused them.  Defendant admitted exposing himself and masturbating in front of Mi. and A.  Given the equivocal nature of the

17

character evidence defendant sought to admit, we cannot find its admission would have altered the result.

## II

### *Cross-Examination of Victims' Father*

Defendant sought to cross-examine M. and S.'s father as to whether he would drop the charges against defendant if he could. The court denied the request, a denial defendant contends was prejudicial and denied him his constitutional right to confrontation.

<u>Background</u>

At trial, M. and S.'s father described his friendship with defendant and defendant's biweekly visits to their home. During the visits, defendant spent time with his daughters. He described the incident with S. and defendant on the couch. He overheard S. talk about telling her mother when someone touches her "tutu," and then defendant left. When M. and S.'s parents later spoke to S. about her words, M. told them she had the same problem with defendant. Their parents notified the police a short time later.

During cross-examination, their father testified he never witnessed any misconduct between defendant and his daughters. He also stated that when they were young, M. and S. "were not very honest" and sometimes lied or exaggerated. He liked and missed defendant.

When asked by defense counsel, he said he would drop the charges against defendant if he could. The prosecution objected to the testimony as impermissible. Defense counsel argued the testimony went to M. and S.'s father's credibility and "how he look[ed] at this case." The court sustained the objection, admonished the jury to disregard the answer, and struck it from the record.

18

Discussion

Defendant argues the trial court erred in denying defendant the opportunity to cross-examine that M. and S.'s father said he would drop the charges if he could. The denial violated defendant's right to confrontation and cross-examination.

In determining the credibility of a witness, the jury may consider any matter that has a tendency in reason to prove or disprove the truthfulness of testimony. The existence or nonexistence of a bias, interest, or other motive on the part of the witness is relevant to the truthfulness of a witness's testimony. (Evid. Code, § 780, subd. (f); *People v. Williams* (2008) 43 Cal.4th 584, 634.) We review the trial court's evidentiary rulings for an abuse of discretion. (*People v. Riggs* (2008) 44 Cal.4th 248, 290.)

Defendant contends the excluded cross-examination foreclosed him from exposing ulterior motives for M. and S.'s father's belated reporting of S.'s statement to the police and testifying as to its incriminating nature. In effect, defendant's cross-examination would have revealed their father would drop the charges because they were not true. "A reasonable juror might have received a significantly different impression of [M. and S.'s father's] credibility had defense counsel been permitted to pursue this proposed line of inquiry."

Given the speculative nature of defendant's argument, we cannot conclude the court abused its discretion in denying the requested cross-examination. Defense counsel had the opportunity to cross-examine M. and S.'s father on why he failed to report defendant's acts against M. and S. immediately. Nor is it clear that if he were inclined to dismiss the charges, why he would testify corroborating M. and S. unless it was the truth. We find no error.

## III

### *Admission of Evidence of Uncharged Sexual Acts*

Defendant contends the trial court erred in allowing propensity and disposition evidence to be introduced under Evidence Code section 1108, subdivision (a). According to defendant, the introduction of such evidence violated his right to a fair trial.

<u>Background</u>

Prior to trial, the prosecution filed a motion requesting evidence of uncharged acts by defendant be admitted. The acts sought to be admitted included the incident in 2000 when defendant masturbated in front of Mi. and the 2008 incident when defendant asked to masturbate in front of T. and showed her a picture of his penis.

The prosecution argued, under Evidence Code section 1108, subdivision (a), the uncharged crimes need not be sufficiently similar to the charged offenses and any dissimilarity went to the weight of the evidence not its admissibility. In addition, the uncharged conduct was not too remote in time. The prosecution also contended the acts were admissible under Evidence Code section 1101, subdivision (b), to establish intent, common plan, or scheme and to corroborate the victims' testimony. Moreover, the evidence was more probative than prejudicial under Evidence Code section 352.

In response, defense counsel argued the uncharged prior acts were inadmissible because they proved only bad character, violated his right to due process, were irrelevant and remote in time, and were more prejudicial than probative. Defense counsel also challenged admissibility under Evidence Code section 1101, subdivision (b), arguing the acts were not sufficiently similar to the charged offenses to permit inference of intent or establish a common plan or scheme.

The trial court held a hearing on the motion. The prosecution sought to introduce Mi.'s and T.'s testimony, evidence of convictions for both incidents, and testimony by the officer who found child pornography on defendant's computer and cell phone. Mi.'s

and T.'s testimony revealed defendant's attraction to young girls and his propensity for molesting young girls.

Defense counsel countered that the 2000 incident was too remote in time and the uncharged conduct was not substantially similar to the charged offense. In addition, propensity to commit one kind of act did not demonstrate propensity to commit another type of sex act. Defendant's 2002 plea did not necessarily prove the underlying facts.

The trial court granted the motion, finding the evidence of uncharged acts revealed a propensity for targeting young girls. Under the Evidence Code section 352 analysis, the court did not find the evidence cumulative or prejudicial. Although the uncharged acts did not constitute the same crime, there were distinctive similarities since all the crimes involved young girls. The uncharged crimes tended to invoke emotion; however, they were no more inflammatory than the charged acts. The actual convictions decreased any potential prejudice because they eliminated the risk that the jury would punish defendant for the uncharged acts.

Defendant argued his conviction for child pornography found on his cell phone should be excluded as separate and distinct from his actions with T. The court found the pornography substantially probative because it involved children, and all the victims were children. In addition, the court found both the conduct that did not result in conviction, his acts with T., and the conviction admissible because both had substantial probative value and were no more inflammatory than the charged offenses.

The prosecution also requested the evidence of uncharged conduct be admitted on the issue of intent under Evidence Code section 1101, subdivision (b). The prosecution argued defendant's intent to satisfy himself was the same in both the charged and uncharged offenses and the uncharged offenses revealed a common scheme to seek out the children of friends and family members. Defendant argued intent was not an issue because he contended the touching never took place and there was insufficient similarity between the charged and uncharged conduct.

21

The trial court also admitted the evidence under Evidence Code section 1101, subdivision (b), but only for the purpose of showing defendant's intent. Mi. and T. testified regarding defendant's uncharged conduct. Evidence of the resulting convictions and defendant's possession of child pornography on his cell phone were also admitted at trial.

Discussion

In general, evidence of a defendant's uncharged conduct is not admissible to prove that the defendant has a criminal disposition or propensity. (Evid. Code, § 1101, subd. (a); *People v. Kipp* (1998) 18 Cal.4th 349, 369.) But Evidence Code section 1108 provides that when a defendant is charged with a sexual offense, evidence of the defendant's other sexual offenses is not made inadmissible by Evidence Code section 1101 if the evidence is not inadmissible under Evidence Code section 352.

The Legislature, in enacting Evidence Code section 1108, recognized that "sex crimes are usually committed in seclusion without third party witnesses or substantial corroborating evidence. The ensuing trial often presents conflicting versions of the event and requires the trier of fact to make difficult credibility determinations." (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1160; *People v. Falsetta* (1999) 21 Cal.4th 903, 911 (*Falsetta*).) Evidence Code section 1108 allows the trier of fact to consider uncharged sexual offense evidence as evidence of the defendant's propensity to commit sexual offenses in evaluating the defendant's and the victim's credibility and in deciding whether the defendant committed the charged sexual offense. (*Villatoro, supra*, at pp. 1160, 1164, 1166-1167; *Falsetta, supra*, at pp. 911-912, 922.)

In addition, uncharged sexual conduct evidence is admissible if the probative value of the evidence is substantially outweighed by the probability its admission will necessitate undue consumption of time or create substantial danger of undue prejudice, of confusing the issues, or misleading the jury. (Evid. Code, §§ 352, 1108, subd. (a).)

22

The Supreme Court has provided guidance on the admissibility of prior sexual offenses: "Rather than admit or exclude every sex offense a defendant commits, trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*Falsetta, supra*, 21 Cal.4th at p. 917.)

We review the trial court's Evidence Code section 352 determination under the deferential abuse of discretion standard. (*People v. Avila* (2014) 59 Cal.4th 496, 515.) We will not reverse unless the trial court exercised its discretion in an arbitrary, capricious, or absurd manner resulting in a miscarriage of justice. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1004.)

Defendant argues "Irrelevant, dissimilar acts of voyeurism and exhibitionism from indecent exposure, annoying a child with sexual content, and possession of child pornography did not rationally prove propensity and disposition to touch. [Citations.] The erroneous evidence did little more than show defendant was a sex offender." He also contends the prior acts from 2000 and 2008 were remote and the testimony of the four girls involved an undue consumption of time.

Defendant relies on *People v. Harris* (1998) 60 Cal.App.4th 727 (*Harris*), *People v. Jandres* (2014) 226 Cal.App.4th 340 (*Jandres*), and *People v. Earle* (2009) 172 Cal.App.4th 372 (*Earle*) to underscore the lack of similarity between the charged and uncharged offenses. We find these cases distinguishable.

In *Harris*, the defendant, a mental health nurse, was charged with assaulting two patients in 1995. In 1972, the defendant had been convicted of first degree burglary with

23

infliction of great bodily injury. The defendant had entered a woman's apartment, beat her unconscious, and inflicted extensive injuries on her vagina and rectum. During the trial on the 1995 charges, the prosecution introduced a redacted description of the prior crime, describing the victim's injuries and the fact that the defendant had been found nearby with blood on his clothes and person. (*Harris, supra*, 60 Cal.App.4th at pp. 730-735.) The appellate court found the evidence should have been excluded under Evidence Code section 352: "This altered version of a 23-year-old act of inexplicable sexual violence while heavy with 'undue prejudice' and dangerous in the hands of the jury was not particularly probative of the defendant's predisposition to commit these 'breach of trust' sex crimes." (*Harris, supra*, at pp. 740-741.)

In *Jandres*, the defendant was charged with forcible rape and kidnapping to commit rape. The uncharged act took place during an attempted burglary. The defendant lifted a girl off a couch and dropped her. He also briefly shoved his finger in her mouth. (*Jandres, supra*, 226 Cal.App.4th at pp. 343, 349.) The appellate court found the evidence improperly admitted, noting the differences between the circumstances surrounding the two crimes, the different ages of the victims, and the different nature of the conduct. The court concluded evidence that the defendant exhibited sexual interest in an 11-year-old girl by fingering her in the mouth did not support an inference that he was predisposed to rape an 18-year-old woman. (*Id.* at p. 356.)

Finally, in *Earle* the trial court denied the defendant's motion to sever a misdemeanor indecent exposure charge from a completely unrelated felony sexual assault charge. The appellate court found the exposure charge, which was the stronger of the two charges, possessed the potential to inflame the jury. Joining the charges prejudiced the defendant since he would not have been found guilty of assault absent the exposure charge. (*Earle, supra*, 172 Cal.App.4th at pp. 378, 401-402, 409, 412.)

In the present case, the trial court considered the uncharged acts and found they shared common characteristics with the charged acts. All defendant's actions were

perpetrated against similar victims: young girls who defendant knew and took advantage of a position of trust in order to commit the crimes. Unlike the cases cited by defendant, the uncharged and charged conduct were neither dissimilar nor unconnected. The similarities cited by the trial court supported the inference that defendant had a propensity to commit sex offenses, including the charged crimes.

Nor are we convinced by defendant's contention that the uncharged conduct was more prejudicial than probative under Evidence Code section 352.[2] Our review of the uncharged evidence admitted by the trial court reveals it had substantial probative value, did not confuse the issues, and was not more inflammatory than the charged offenses. In addition, the trial court instructed the jury that the uncharged offenses alone did not constitute sufficient proof defendant was guilty of the charged offenses. The instruction informed the jury it had to find defendant guilty of the charged offenses beyond a reasonable doubt.

IV

*One Strike Law*

The third amended information alleged that the offenses defendant was accused of committing, violations of section 288, subdivision (a), were subject to the One Strike Law, and that defendant was subject to a sentence enhancement under that law because he committed the offenses against more than one victim. (§ 667.61, subds. (c)(8), (e)(4).) The jury found true the multiple victim allegation. The One Strike law in that circumstance increases the sentence for each applicable offense to an indeterminate prison term of 15 years to life. (§ 667.61, subd. (b).)

---

[2] Defendant points out that the jurors requested the testimony of A., B., S., and M. as well as defendant's testimony regarding M. and S. Defendant contends the jurors' requests indicate it was a close case.

However, in her sentencing memorandum, the prosecutor argued that defendant should be sentenced on counts one through three to indeterminate terms of 25 years to life because the victims in those counts were under the age of 14 years, a factor that under the One Strike law requires the court to impose an indeterminate term of 25 years to life. (§ 667.61, subd. (j)(2).) The trial court sentenced defendant to indeterminate terms of 25 years to life on counts one through three.

In supplemental briefing, defendant contended that the People's failure to plead the enhancement for victims under the age of 14 under section 667.61, subdivision (j)(2) violated his due process right to notice when the trial court imposed 25-year-to-life sentences on counts one through three. In our earlier opinion, we disagreed with defendant and concluded his due process rights were not violated.

Subsequently, the California Supreme Court granted defendant's petition for review and transferred the matter to our court to reconsider our opinion in light of *In re Vaquera* (2024) 15 Cal.5th 706 (*Vaquera*).) Having reconsidered the issue, we agree with defendant that he was denied his due process right to notice when he was sentenced on counts one through three to 25 years to life. The Attorney General also concedes the error.

The One Strike law provides an alternative and harsher sentencing scheme for certain sex crimes listed in the statute's subdivision (c). (§ 667.61, subd. (c); *Vaquera, supra*, 15 Cal.5th at p. 713.) One of those crimes is a violation of section 288, subdivision (a), the statute under which defendant was convicted on counts one through three. (§ 667.61, subd. (c)(8).) For the One Strike law to apply, the prosecution must plead and prove specific factual circumstances in addition to the underlying sex offense. (*Vaquera,* at p. 713.) If a jury finds a One Strike law allegation to be true, the offense generally will be punishable by an indeterminate sentence of either 15 years to life or 25 years to life. (*Ibid.*; § 667.61, subds. (a)-(e).)

As relevant here, under subdivision (b) of section 667.61, if the jury finds

defendant is guilty of violating section 288, subdivision (a), the sentence is 15 years to life if the prosecution also pleads and the jury finds that the crime was committed under one of the factual circumstances listed in subdivision (e) of the statute.  (§ 667.61, subd. (b).)  One of those circumstances is the multiple victim circumstance the prosecution pleaded and the jury found true in this case.  (§ 667.61, subd. (e)(4).)

However, the court must impose a sentence of 25 years to life or life without parole for a violation of section 288, subdivision (a) if the prosecution pleads and proves a One Strike circumstance involving a minor victim.  (§ 667.61, subds. (j), (l), (m); *Vaquera, supra*, 15 Cal.5th at pp. 713-714.)  Among those factual circumstances is subdivision (j)(2), under which defendant was sentenced on counts one through three.  Subdivision (j)(2) imposes a sentence of 25 years to life on a person who is convicted of a violation of section 288, subdivision (a) under one of the circumstances specified in subdivision (e) (here, the multiple victim circumstance) if the offense was committed on a child under 14 years of age.  (§ 667.61, subd. (j)(2).)

A One Strike law sentence cannot be imposed in violation of a defendant's "due process right to fair notice of any sentencing allegation that, if proven, will increase the punishment for a crime."  (*Vaquera, supra*, 15 Cal.5th at p. 717.)  "In the sentencing enhancement context, the touchstone of fair notice is whether the accusatory pleading enables the defense to predict the sentence the defendant faces if convicted.  To enable a defendant to make this prediction, an accusatory pleading must provide the defendant with fair notice of the factual basis on which the prosecution is seeking an increased punishment and of 'the potential sentence.' "  (*Ibid*.)  "Since an accusatory pleading that fails to inform the defendant that the prosecution is pursuing a particular sentencing enhancement in connection with a specific count does not allow the defendant to predict the potential sentence, such a pleading does not provide fair notice."  (*Id*. at pp. 717-718.)

Here, the third amended information alleged in counts one through three that defendant committed lewd and lascivious acts on a child under the age of 14 years in

27

violation of section 288, subdivision (a).)  The information also alleged a multiple victims enhancement under section 667.61, subdivision (e)(4), but that allegation did not allege the victims were under 14 years of age or expressly allege subdivision (j)(2).  The entire allegation reads:  "It is further alleged, as to Counts One through Nine, that the defendant . . . has been convicted in the present case or cases of committing an offense specified in subdivision (c) against more than one victim, within the meaning of Penal Code Section 667.61(e)(4).)"

The information at issue in *Vaquera* similarly alleged violations of section 288, subdivision (a), and it contained a One Strike law allegation that alleged only the multiple victim circumstance under subdivision (e)(4).  (*Vaquera, supra*, 15 Cal.5th at p. 714.)  In a late sentencing brief, the prosecution asked the court to sentence the defendant to 25 years to life on one of the counts under subdivision (j)(4), which the trial court did.  (*Id.* at p. 715.)  The California Supreme Court ruled that the One Strike law allegation in the information did not satisfy the defendant's due process right to notice of a sentencing allegation that would increase the defendant's punishment due to the victim's age.  (*Id.* at pp. 724-725.)

To satisfy the defendant's due process right, the accusatory pleading must "provide the defendant fair notice of the particular One Strike sentence the prosecution is seeking and of which facts it intends to prove to support that sentence."  (*Vaquera, supra*, 15 Cal.5th at p. 720.)  "An accusatory pleading need not specify the number of the pertinent sentencing statute, so long as it otherwise clearly notifies the accused of the factual basis on which it is seeking a longer sentence and the information necessary to calculate sentencing exposure. . . .  In the One Strike law context, we have observed that '[a]dequate notice can be conveyed by a reference to the description of the qualifying circumstance' in the One Strike allegation accompanied by either a general 'reference to section 667.61' or a more specific reference to the relevant subdivision of section 667.61.  [Citation.]  If a One Strike allegation describes the specific factual circumstance based on

28

which the prosecution seeks One Strike sentencing and cites to section 667.61, the allegation does not necessarily need to specify the sentence (i.e., '15 years to life,' '25 years to life,' or 'life without the possibility of parole') or cite to the specific subdivision of section 667.61 that provides the applicable enhanced penalty. [Citations.] Similarly, a One Strike allegation need not specify the factual basis of the sentence the prosecution is seeking if the allegation's text otherwise makes clear that the prosecution intends to rely on the facts alleged in connection with the underlying count to seek imposition of a specific One Strike sentence on that count." (*Id*. at pp. 719-720.)

The information in *Vaquera* did not meet this standard to support imposing a 25-years-to-life sentence under subdivision (j)(2). Its One Strike law allegation informed the defendant only that the prosecution was seeking a 15-years-to-life sentence under subdivision (e)(4). (*Vaquera, supra*, 15 Cal.5th at pp. 721-722.) The information did not properly invoke subdivision (j)(2) specifically or by pleading the facts of that circumstance or the underlying crime as part of the One Strike allegation. (*Id*. at p. 724.)

The One Strike law allegation in the information before us is similarly deficient. It notified defendant only that the prosecution was seeking a 15-years-to-life One Strike sentence due solely to the crimes involving more than one victim within the meaning of subdivision (e)(4). Nothing in the allegation gave the defendant sufficient information from which he could have predicted that he could be sentenced to prison terms of 25 years to life pursuant to subdivision (j)(2) because the victims in counts one through three were under the age of 14. Although an element of an offense under section 288, subdivision (a) is that the victim be under the age of 14, *Vaquera* requires a One Strike allegation either to expressly plead that factual circumstance with a citation to the One Strike law or make "clear that the prosecution intends to rely on the facts alleged in connection with the underlying count to seek imposition of a specific One Strike sentence on that count." (*Vaquera, supra*, 15 Cal.5th at p. 720.) The One Strike allegation in the third amended information did neither.

We will remand the matter for the trial court to vacate sentencing on counts one through three and to resentence defendant to a state prison term of 15 years to life for each of those counts.

V

*Senate Bill No. 567*

We granted defendant leave to raise two additional sentencing arguments on transfer. In the first, defendant contends he is entitled to have the ameliorative sentencing provisions of Senate Bill Nos. 567 (2021-2021 Reg. Sess.) and 483 (2021-2022 Reg. Sess.) applied retroactively to his case and to a full resentencing on remand.

At the time of defendant's sentencing in 2016, under former section 1170, a trial court when sentencing based on a triad had discretion to choose between a lower, middle, or upper prison term based on which term best served the interests of justice. (*People v. Lynch* (2024) 16 Cal.5th 730, 747 (*Lynch*).) Exercising its discretion under that statute, the trial court sentenced defendant on count four to the upper term of eight years for a violation of section 288, subdivision (a) as a lesser included offense. The court imposed the upper term based on it finding true the sole aggravating factor that defendant's prior convictions as an adult or sustained petitions in juvenile delinquency proceedings were numerous or of increasing seriousness. (Cal. Rules of Court, rule 4.421(b)(2).)

Effective January 1, 2022, Senate Bill No. 567 amended section 1170 to limit the trial court's discretion when imposing upper term sentences. Now, a trial court, when faced with three possible sentencing terms, must in its discretion impose the middle term. (§ 1170, subd. (b)(1); Stats 2021, ch. 731, § 1.3 (Senate Bill 567).) The court may impose an upper term only when aggravating circumstances justify imposing an upper term and the facts underlying those circumstances are stipulated by the defendant or found true beyond a reasonable doubt by the jury or court trial. (§ 1170, subd. (b)(2).) However, the trial court may consider the defendant's prior convictions in determining

30

sentencing based on a certified record of convictions without submitting the prior convictions to a jury. (§ 1170, subd. (b)(3).)

In addition, as a result of Senate Bill 567, the lower term is now the presumptive term if, among other circumstances, the defendant experienced psychological, physical, or childhood trauma, such as abuse, neglect, or sexual violence, and that trauma was a contributing factor in the defendant committing the offense unless the trial court finds that the aggravating circumstances outweigh the mitigating circumstances such that imposing the lower term would be contrary to the interests of justice. (§ 1170, subd. (b)(6)(A).)

Defendant contends that Senate Bill 567's ameliorative provisions apply retroactively to this nonfinal case. He argues that as a result, the upper term sentence on count four cannot stand as it violated section 1170, subdivision (b)(1)'s presumption that the middle term be imposed. He did not stipulate to any facts in aggravation, and the trial court did not rely on a certified record of conviction to impose the upper term based on his prior convictions.

Defendant also argues the upper term sentence on count four violates section 1170, subdivision (b)(6)(A)'s presumption of imposing the lower term in his circumstances. He testified he was the victim of sexual abuse as a minor, and defense counsel argued the abuse was a contributing factor to defendant's commission of the current crimes. Thus, the trial court was required to impose the lower term unless the interests of justice demanded otherwise.

Defendant argues these sentencing discrepancies are prejudicial, and he is entitled to a full resentencing on all counts. There is no dispute that the ameliorative provisions of Senate Bill 567 apply retroactively to this nonfinal case. (*Lynch, supra*, 16 Cal.5th at pp. 748-749.) We address defendant's contention that under subdivision (b)(6)(A), the lower term was the presumptive term for count four. The Attorney General offers no opposition to defendant's claim.

31

The record discloses that defendant "may have suffered a qualifying trauma, which would appear to meet the statute's threshold requirement for triggering the lower term presumption." (*People v. Salazar* (2023) 15 Cal.5th 416, 419 (*Salazar*).)  Defendant testified he was molested beginning at the age of six years.  The molestations occurred over the next six years by three people and included instances of rape and oral copulation. At sentencing, defense counsel argued the repeated molestations turned defendant into an exhibitionist at the age of 12, and he continued engaging in that behavior into adulthood. Defendant admitted he was convicted of indecent exposure to three girls in 1994 and to a 17-year-old girl in 1996.  The court also found that defendant was convicted of indecent exposure for an incident in 2003 and possession of child pornography in 2008.  This was sufficient evidence that defendant may qualify for the presumptive lower term under section 1170, subdivision (b)(6)(A).

Where a sentencing court was not aware of the full scope of its discretionary powers under section 1170, subdivision (b)(6)(A) at the time it sentenced the defendant, " 'the appropriate remedy is to remand for resentencing unless the record "clearly indicate[s]" that the trial court would have reached the same conclusion "even if it had been aware that it had such discretion." ' " (*Salazar, supra*, 15 Cal.5th at p. 419, quoting *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.)  In other words, we must remand for resentencing unless the record "clearly indicates" that the trial court would have departed from the presumptive lower term and imposed the same upper term sentence in the "interests of justice." (*Salazar,* at pp. 425, 427; § 1170, subd. (b)(6)(A).)

The record does not "clearly indicate" that the trial court would not have imposed the presumptive lower term in the interests of justice had it been aware of its limited discretion under section 1170, subdivision (b)(6)(A).  The trial court justified imposing the upper term based on defendant's numerous or increasingly serious prior convictions. (Cal. Rules of Court, rule 4.421(b)(2).)  The court also denied defendant's motion to run the sentences concurrently.  But the court gave no other indication that would assist us in

determining whether it would impose the upper term on count four under the requirements of section 1170, subdivision (b)(6)(A). Defendant's criminal history and the nature of his offenses, without more, do not clearly indicate the court would have imposed the upper term under the new law. (See *Salazar, supra*, 15 Cal.5th at p. 426.)

"[W]hen the applicable law governing the defendant's sentence has substantively changed after sentencing, it is almost always speculative for a reviewing court to say what the sentencing court would have done if it had known the scope of its discretionary powers at the time of sentencing. Accordingly, when, as here, a sentencing court was not fully aware of the scope of its discretionary powers, 'the appropriate remedy is to remand for resentencing unless the record "clearly indicate[s]" that the trial court would have reached the same conclusion "even if it had been aware that it had such discretion." ' " (*Salazar, supra*, 15 Cal.5th at p. 425.) Because the record does not clearly indicate what the trial court's decision would have been, we will remand for resentencing.

When an appellate court remands a case for resentencing, the trial court is entitled to consider the entire sentencing scheme and may reconsider all sentencing choices. (*People v. Buycks* (2018) 5 Cal.5th 857, 893; *People v. Walker* (2021) 67 Cal.App.5th 198, 204.) Because defendant will receive a full resentencing due to our remand, we need not address defendant's remaining sentencing arguments under Senate Bill 567.

VI

*Senate Bill Nos. 136 and 483*

Defendant's second sentencing argument concerns the application of Senate Bill No. 483 (2021-2022 Reg. Sess.) (Senate Bill 483). Prior to issuing our original opinion, we granted defendant's request to submit supplemental briefing to address the trial court's imposition of prior prison term enhancements in light of Senate Bill No. 136 (2019-2020 Reg. Sess.) (Senate Bill 136). Senate Bill 136 amended section 667.5, subdivision (b) to render defendant's prison prior enhancements invalid. (§ 667.5, subd.

(b); Stats. 2019, ch. 590, § 1.) We agreed with defendant that Senate Bill 136 required us to strike all enhancements based on his five prison priors, but we did not remand for resentencing because the trial court had imposed the maximum sentence.

After the California Supreme Court granted review of this matter, the Legislature enacted Senate Bill 483. That law declared that most enhancements imposed under former section 667.5, subdivision (b), including defendant's, were legally invalid. (Stats. 2021, ch. 728, § 3.) It also provided a procedural remedy for defendants who had received the invalid prison prior enhancements to have them stricken. (Stats. 2021, ch. 728, § 3.) The new remedy, now codified at section 1172.75, directed the Secretary of the Department of Corrections and Rehabilitation and the correctional administrator of each county to identify those inmates in their custody who were serving terms that included the invalid enhancements and provide that information to the sentencing court that imposed the enhancement. (§ 1172.75, subd. (b); Stats. 2022, ch. 58, § 12.) The statute ordered the trial court to recall an inmate's sentence and resentence him or her if the court verified that the judgment included an invalid enhancement under former section 667.5, subdivision (b). (§ 1172.75, subd. (c).) The trial court was to complete this resentencing by December 31, 2023. (§ 1172.75, subd. (c)(2).)

The Supreme Court transferred this matter to us on May 15, 2024. It directed us to vacate our earlier opinion, which we did, including our striking of defendant's invalid prison prior enhancements. We granted defendant leave to address Senate Bill 483, and both he and the Attorney General have argued the matter in their supplemental briefs.

Because we are remanding the case for a full resentencing, we need not address defendant's argument. The parties may raise their contentions regarding the application of Senate Bill 483 to the trial court, who is best equipped to resolve in the first instance any factual issues that may need to be addressed under section 1172.75.

DISPOSITION

The matter is remanded with directions to vacate sentencing on counts one through three and resentence defendant to a state prison term of 15 years to life on each of those counts, vacate the upper term sentence on count four, and otherwise conduct a full resentencing. Following resentencing, the trial court is directed to issue a corrected abstract of judgment reflecting the sentence modifications and forward a certified copy to the Department of Corrections and Rehabilitation. The judgment is otherwise affirmed.

 

 

_____
HULL, Acting P. J.

 

We concur:

 

_____
ROBIE, J.

 

_____
MESIWALA, J.